# LORILLARD TOBACCO CO. ET AL. *v.* REILLY, ATTORNEY GENERAL OF MASSACHUSETTS, ET AL.

No. 00–596.  Argued April 25, 2001—Decided June 28, 2001*

---

*Together with No. 00–597, *Altadis U. S. A. Inc., as Successor to Consolidated Cigar Corp. and Havatampa, Inc., et al.* v. *Reilly, Attorney General of Massachusetts, et al.*, also on certiorari to the same court.

528

O'CONNOR, J., delivered the opinion of the Court, Parts I, II–C, and II–D of which were unanimous; Parts III–A, III–C, and III–D of which were joined by REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, and THOMAS, JJ.; Part III–B–1 of which was joined by REHNQUIST, C. J., and STEVENS, SOUTER, GINSBURG, and BREYER, JJ.; and Parts II–A, II–B, III–B–2, and IV of which were joined by REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which SCALIA, J., joined, *post*, p. 571. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 572. SOUTER, J., filed an opinion concurring in part and dissenting in part, *post*, p. 590. STEVENS, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, in which GINSBURG and BREYER, JJ., joined, and in which SOUTER, J., joined as to Part I, *post*, p. 590.

*Jeffrey S. Sutton* argued the cause for petitioners in No. 00–596. With him on the briefs were *Daniel P. Collins, Michael R. Doyen, Fred A. Rowley, Jr., Kenneth S. Geller, Andrew L. Frey, Richard M. Zielinski, John L. Strauch, Gregory G. Katsas, John B. Connarton, Jr., Patricia A. Barald,* and *David H. Remes. James V. Kearney* filed a brief for petitioners in No. 00–597. With Mr. Kearney on the brief were *Christopher Harris* and *Richard P. Bress. Peter J. McKenna* and *Eric S. Sarner* filed a brief for petitioner U. S. Smokeless Tobacco Company in both cases.

*William W. Porter,* Assistant Attorney General of the Commonwealth of Massachusetts, argued the cause for respondents in both cases. With him on the brief were *Thomas F. Reilly,* Attorney General, and *Susan Paulson,* Assistant Attorney General.

*Acting Solicitor General Underwood* argued the cause for the United States as *amicus curiae* urging affirmance.

With her on the brief were *Acting Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, Irving L. Gornstein,* and *Douglas N. Letter.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Advertising Federation et al. by *Daniel E. Troy* and *Robin S. Conrad;* for the American Association of Advertising Agencies et al. by *Penelope S. Farthing;* for the Association of National Advertisers, Inc., by *Steven G. Brody, John J. Walsh,* and *Gilbert H. Weil;* for Infinity Outdoor, Inc., et al. by *Floyd Abrams* and *Joel Kurtzberg;* for the National Association of Convenience Stores by *Scott A. Sinder* and *John B. Williams;* for the Newspaper Association of America et al. by *Bruce E. H. Johnson, P. Cameron DeVore, René P. Milam, Steven R. Shapiro, Stuart D. Karle, Robin Bierstedt, Lucy Dalglish,* and *Gregg Leslie;* for the Product Liability Advisory Council, Inc., by *Leslie G. Landau;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Seth E. Mermin* and *Corinne Lee Murphy,* Deputy Attorneys General of California, *Bill Lockyer,* Attorney General, *Richard M. Frank,* Chief Assistant Attorney General, *Herschel T. Elkins* and *Dennis Eckhart,* Senior Assistant Attorneys General, *Ronald A. Reiter,* Supervising Deputy Attorney General, and *Robert R. Rigsby,* Corporation Counsel of the District of Columbia, and by the Attorneys General for their respective jurisdictions as follows: *Bruce M. Botelho* of Alaska, *Janet Napolitano* of Arizona, *Mark Pryor* of Arkansas, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Earl I. Anzai* of Hawaii, *Alan G. Lance* of Idaho, *Jim Ryan* of Illinois, *Steve Carter* of Indiana, *Tom Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Steve Rowe* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Mike Hatch* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah W. Nixon* of Missouri, *Mike McGrath* of Montana, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *John Farmer* of New Jersey, *Patricia Madrid* of New Mexico, *Eliot Spitzer* of New York, *Wayne Stenehjem* of North Dakota, *Herbert D. Soll* of the Northern Mariana Islands, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Mike Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Mark Barnett* of South Dakota, *Paul Summers* of Tennessee, *John Cornyn* of Texas, *Mark Shurtleff* of Utah, *William H. Sorrell* of Vermont, *Christine O. Gregoire* of Washington, *Darrel V. McGraw, Jr.,* of West Virginia, and *James E. Doyle* of Wisconsin; for the Cities of Oakland, California, et al. by *Stephen P. Berzon, Michael E. Wall, Lawrence Rosenthal,* and *Benna Ruth Solomon;*

JUSTICE O'CONNOR delivered the opinion of the Court.

In January 1999, the Attorney General of Massachusetts promulgated comprehensive regulations governing the advertising and sale of cigarettes, smokeless tobacco, and cigars. 940 Code of Mass. Regs. §§ 21.01–21.07, 22.01–22.09 (2000). Petitioners, a group of cigarette, smokeless tobacco, and cigar manufacturers and retailers, filed suit in Federal District Court claiming that the regulations violate federal law and the United States Constitution. In large measure, the District Court determined that the regulations are valid and enforceable. The United States Court of Appeals for the First Circuit affirmed in part and reversed in part, concluding that the regulations are not pre-empted by federal law and do not violate the First Amendment. The first question presented for our review is whether certain cigarette advertising regulations are pre-empted by the Federal Cigarette Labeling and Advertising Act (FCLAA), 79 Stat. 282, as amended, 15 U. S. C. § 1331 *et seq.* The second question presented is whether certain regulations governing the advertising and sale of tobacco products violate the First Amendment.

---

for the City of Los Angeles et al. by *Mark E. Haddad, James M. Harris, Joseph R. Guerra,* and *James K. Hahn;* for the City of New York et al. by *Michael D. Hess, Leonard J. Koerner, Elizabeth Susan Natrella, Richard M. Weinberg,* and *Sandra R. Gutman;* for the American Legacy Foundation by *A. Stephen Hut, Jr., John Payton, Patrick J. Carome,* and *Matthew A. Brill;* for the American Medical Association et al. by *Donald W. Garner;* for the National Center for Tobacco-Free Kids et al. by *David Vladeck, Allison M. Zieve, Alan B. Morrison,* and *Matthew L. Myers;* for the National Conference of State Legislatures et al. by *Richard Ruda, James I. Crowley,* and *D. Bruce La Pierre;* and for the Tobacco Control Resource Center, Inc., by *Richard A. Daynard.*

Briefs of *amici curiae* were filed for the State's Attorney of Dupage County, Illinois, et al. by *Richard Hodyl, Jr., Joseph E. Birkett,* and *Nancy J. Wolfe;* and for the American Planning Association by *Randal R. Morrison.*

I

In November 1998, Massachusetts, along with over 40 other States, reached a landmark agreement with major manufacturers in the cigarette industry. The signatory States settled their claims against these companies in exchange for monetary payments and permanent injunctive relief. See App. 253–258 (Outline of Terms for Massachusetts in National Tobacco Settlement); Master Settlement Agreement (Nov. 23, 1998), http://www.naag.org. At the press conference covering Massachusetts' decision to sign the agreement, then-Attorney General Scott Harshbarger announced that as one of his last acts in office, he would create consumer protection regulations to restrict advertising and sales practices for tobacco products. He explained that the regulations were necessary in order to "close holes" in the settlement agreement and "to stop Big Tobacco from recruiting new customers among the children of Massachusetts." App. 251.

In January 1999, pursuant to his authority to prevent unfair or deceptive practices in trade, Mass. Gen. Laws, ch. 93A, § 2 (1997), the Massachusetts Attorney General (Attorney General) promulgated regulations governing the sale and advertisement of cigarettes, smokeless tobacco, and cigars. The purpose of the cigarette and smokeless tobacco regulations is "to eliminate deception and unfairness in the way cigarettes and smokeless tobacco products are marketed, sold and distributed in Massachusetts in order to address the incidence of cigarette smoking and smokeless tobacco use by children under legal age . . . [and] in order to prevent access to such products by underage consumers." 940 Code of Mass. Regs. § 21.01 (2000). The similar purpose of the cigar regulations is "to eliminate deception and unfairness in the way cigars and little cigars are packaged, marketed, sold and distributed in Massachusetts [so that] . . . consumers may be adequately informed about the health

risks associated with cigar smoking, its addictive properties, and the false perception that cigars are a safe alternative to cigarettes . . . [and so that] the incidence of cigar use by children under legal age is addressed . . . in order to prevent access to such products by underage consumers." *Ibid.* The regulations have a broader scope than the master settlement agreement, reaching advertising, sales practices, and members of the tobacco industry not covered by the agreement. The regulations place a variety of restrictions on outdoor advertising, point-of-sale advertising, retail sales transactions, transactions by mail, promotions, sampling of products, and labels for cigars.

The cigarette and smokeless tobacco regulations being challenged before this Court provide:

> "(2) Retail Outlet Sales Practices. Except as otherwise provided in [§ 21.04(4)], it shall be an unfair or deceptive act or practice for any person who sells or distributes cigarettes or smokeless tobacco products through a retail outlet located within Massachusetts to engage in any of the following retail outlet sales practices:
>
> .  .  .  .  .
>
> "(c) Using self-service displays of cigarettes or smokeless tobacco products;
>
> "(d) Failing to place cigarettes and smokeless tobacco products out of the reach of all consumers, and in a location accessible only to outlet personnel." §§ 21.04(2)(c)–(d).
>
> "(5) Advertising Restrictions. Except as provided in [§ 21.04(6)], it shall be an unfair or deceptive act or practice for any manufacturer, distributor or retailer to engage in any of the following practices:
>
> "(a) Outdoor advertising, including advertising in enclosed stadiums and advertising from within a retail establishment that is directed toward or visible from the

outside of the establishment, in any location that is within a 1,000 foot radius of any public playground, playground area in a public park, elementary school or secondary school;

"(b) Point-of-sale advertising of cigarettes or smokeless tobacco products any portion of which is placed lower than five feet from the floor of any retail establishment which is located within a one thousand foot radius of any public playground, playground area in a public park, elementary school or secondary school, and which is not an adult-only retail establishment." §§ 21.04(5)(a)–(b).

The cigar regulations that are still at issue provide:

"(1) Retail Sales Practices. Except as otherwise provided in [§ 22.06(4)], it shall be an unfair or deceptive act or practice for any person who sells or distributes cigars or little cigars directly to consumers within Massachusetts to engage in any of the following practices:

"(a) sampling of cigars or little cigars or promotional give-aways of cigars or little cigars." § 21.06(1)(a).

"(2) Retail Outlet Sales Practices. Except as otherwise provided in [§ 22.06(4)], it shall be an unfair or deceptive act or practice for any person who sells or distributes cigars or little cigars through a retail outlet located within Massachusetts to engage in any of the following retail outlet sales practices:

"(c) Using self-service displays of cigars or little cigars;

"(d) Failing to place cigars and little cigars out of the reach of all consumers, and in a location accessible only to outlet personnel." §§ 22.06(2)(c)–(d).

"(5) Advertising Restrictions. Except as provided in [§ 22.06(6)], it shall be an unfair or deceptive act or practice for any manufacturer, distributor or retailer to engage in any of the following practices:

"(a) Outdoor advertising of cigars or little cigars, including advertising in enclosed stadiums and advertising from within a retail establishment that is directed toward or visible from the outside of the establishment, in any location within a 1,000 foot radius of any public playground, playground area in a public park, elementary school or secondary school;

"(b) Point-of-sale advertising of cigars or little cigars any portion of which is placed lower than five feet from the floor of any retail establishment which is located within a one thousand foot radius of any public playground, playground area in a public park, elementary school or secondary school, and which is not an adult-only retail establishment." §§ 22.06(5)(a)–(b).

The term "advertisement" is defined as:

"any oral, written, graphic, or pictorial statement or representation, made by, or on behalf of, any person who manufactures, packages, imports for sale, distributes or sells within Massachusetts [tobacco products], the purpose or effect of which is to promote the use or sale of the product. Advertisement includes, without limitation, any picture, logo, symbol, motto, selling message, graphic display, visual image, recognizable color or pattern of colors, or any other indicia of product identification identical or similar to, or identifiable with, those used for any brand of [tobacco product]. This includes, without limitation, utilitarian items and permanent or semi-permanent fixtures with such indicia of product identification such as lighting fixtures, awnings, display cases, clocks and door mats, but does not include utilitarian items with a volume of 200 cubic inches or less." §§ 21.03, 22.03.

Before the effective date of the regulations, February 1, 2000, members of the tobacco industry sued the Attorney General in the United States District Court for the District

of Massachusetts. Four cigarette manufacturers (Lorillard Tobacco Company, Brown & Williamson Tobacco Corporation, R. J. Reynolds Tobacco Company, and Philip Morris Incorporated), a maker of smokeless tobacco products (U. S. Smokeless Tobacco Company), and several cigar manufacturers and retailers claimed that many of the regulations violate the Commerce Clause, the Supremacy Clause, the First and Fourteenth Amendments, and Rev. Stat. § 1979, 42 U. S. C. § 1983. The parties sought summary judgment. 76 F. Supp. 2d 124, 127 (1999); 84 F. Supp. 2d 180, 183 (2000).

In its first ruling, the District Court considered the Supremacy Clause claim that the FCLAA, 15 U. S. C. § 1331 *et seq.*, pre-empts the cigarette advertising regulations. 76 F. Supp. 2d, at 128–134. The FCLAA prescribes the health warnings that must appear on packaging and in advertisements for cigarettes. The FCLAA contains a pre-emption provision that prohibits a State from imposing any "requirement or prohibition based on smoking and health . . . with respect to the advertising or promotion of . . . cigarettes." § 1334(b). The FCLAA's pre-emption provision does not cover smokeless tobacco or cigars.

The District Court explained that the central question for purposes of pre-emption is whether the regulations create a predicate legal duty based on smoking and health. The court reasoned that to read the pre-emption provision to proscribe any state advertising regulation enacted due to health concerns about smoking would expand Congress' purpose beyond a reasonable scope and leave States powerless to regulate in the area. The court concluded that restrictions on the location of advertising are not based on smoking and health and thus are not pre-empted by the FCLAA. The District Court also concluded that a provision that permitted retailers to display a black and white "tombstone" sign reading "Tobacco Products Sold Here," 940 Code of Mass. Regs. § 21.04(6) (2000), was pre-empted by the FCLAA.

In a separate ruling, the District Court considered the claim that the Attorney General's regulations violate the First Amendment. 84 F. Supp. 2d, at 183–196. Rejecting petitioners' argument that strict scrutiny should apply, the court applied the four-part test of *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), for commercial speech. The court reasoned that the Attorney General had provided an adequate basis for regulating cigars and smokeless tobacco as well as cigarettes because of the similarities among the products. The court held that the outdoor advertising regulations, which prohibit outdoor advertising within 1,000 feet of a school or playground, do not violate the First Amendment because they advance a substantial government interest and are narrowly tailored to suppress no more speech than necessary. The court concluded that the sales practices regulations, which restrict the location and distribution of tobacco products, survive scrutiny because they do not implicate a significant speech interest. The court invalidated the point-of-sale advertising regulations, which require that indoor advertising be placed no lower than five feet from the floor, finding that the Attorney General had not provided sufficient justification for that restriction. The District Court's ruling with respect to the cigar warning requirements and the Commerce Clause is not before this Court.

The United States Court of Appeals for the First Circuit issued a stay pending appeal, App. 8–9, and affirmed in part and reversed in part the District Court's judgment, *Consolidated Cigar Corp.* v. *Reilly*, 218 F. 3d 30 (2000). With respect to the Supremacy Clause, the Court of Appeals affirmed the District Court's ruling that the Attorney General's cigarette advertising regulations are not preempted by the FCLAA. The First Circuit was persuaded by the reasoning of the Second and Seventh Circuits, which had concluded that the FCLAA's pre-emption provision is ambiguous, and held that the provision pre-empts regula-

tions of the content, but not the location, of cigarette advertising. See *Greater New York Metropolitan Food Council, Inc.* v. *Giuliani,* 195 F. 3d 100, 104–110 (CA2 1999); *Federation of Advertising Industry Representatives, Inc.* v. *Chicago,* 189 F. 3d 633, 636–640 (CA7 1999).

With respect to the First Amendment, the Court of Appeals applied the *Central Hudson* test. 447 U. S. 557 (1980). The court held that the outdoor advertising regulations do not violate the First Amendment. The court concluded that the restriction on outdoor advertising within 1,000 feet of a school or playground directly advances the State's substantial interest in preventing tobacco use by minors. The court also found that the outdoor advertising regulations restrict no more speech than necessary, reasoning that the distance chosen by the Attorney General is the sort of determination better suited for legislative and executive decisionmakers than courts. The Court of Appeals reversed the District Court's invalidation of the point-of-sale advertising regulations, again concluding that the Attorney General is better suited to determine what restrictions are necessary. The Court of Appeals also held that the sales practices regulations are valid under the First Amendment. The court found that the regulations directly advance the State's interest in preventing minors' access to tobacco products and that the regulations are narrowly tailored because retailers have a variety of other means to present the packaging of their products and to allow customers to examine the products.

As for the argument that smokeless tobacco and cigars are different from cigarettes, the court expressed some misgivings about equating all tobacco products, but ultimately decided that the Attorney General had presented sufficient evidence with respect to all three products to regulate them similarly. The Court of Appeals' decision with respect to the cigar warning requirements and the Commerce Clause is not before this Court.

The Court of Appeals stayed its mandate pending disposition of a petition for a writ of certiorari. App. 13. The cigarette manufacturers and U. S. Smokeless Tobacco Company filed a petition, challenging the Court of Appeals' decision with respect to the outdoor and point-of-sale advertising regulations on pre-emption and First Amendment grounds, and the sales practices regulations on First Amendment grounds. The cigar companies filed a separate petition, again raising a First Amendment challenge to the outdoor advertising, point-of-sale advertising, and sales practices regulations. We granted both petitions, 531 U. S. 1068 (2001), to resolve the conflict among the Courts of Appeals with respect to whether the FCLAA pre-empts cigarette advertising regulations like those at issue here, cf. *Lindsey* v. *Tacoma-Pierce County Health Dept.*, 195 F. 3d 1065 (CA9 1999), and to decide the important First Amendment issues presented in these cases.

## II

Before reaching the First Amendment issues, we must decide to what extent federal law pre-empts the Attorney General's regulations. The cigarette petitioners contend that the FCLAA, 15 U. S. C. § 1331 *et seq.*, pre-empts the Attorney General's cigarette advertising regulations.

## A

Article VI, cl. 2, of the United States Constitution commands that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." See also *McCulloch* v. *Maryland*, 4 Wheat. 316, 427 (1819) ("It is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments"). This relatively clear and simple mandate has generated considerable discussion in cases where we have had to discern whether Congress has pre-empted state action in a particu-

lar area. State action may be foreclosed by express language in a congressional enactment, see, *e. g., Cipollone* v. *Liggett Group, Inc.,* 505 U. S. 504, 517 (1992), by implication from the depth and breadth of a congressional scheme that occupies the legislative field, see, *e. g., Fidelity Fed. Sav. & Loan Assn.* v. *De la Cuesta,* 458 U. S. 141, 153 (1982), or by implication because of a conflict with a congressional enactment, see, *e. g., Geier* v. *American Honda Motor Co.,* 529 U. S. 861, 869–874 (2000).

In the FCLAA, Congress has crafted a comprehensive federal scheme governing the advertising and promotion of cigarettes. The FCLAA's pre-emption provision provides:

"(a) Additional statements

"No statement relating to smoking and health, other than the statement required by section 1333 of this title, shall be required on any cigarette package.

"(b) State regulations

"No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U. S. C. § 1334.

The FCLAA's pre-emption provision does not cover smokeless tobacco or cigars.

In these cases, our task is to identify the domain expressly pre-empted, see *Cipollone, supra,* at 517, because "an express definition of the pre-emptive reach of a statute . . . supports a reasonable inference . . . that Congress did not intend to pre-empt other matters," *Freightliner Corp.* v. *Myrick,* 514 U. S. 280, 288 (1995). Congressional purpose is the "ultimate touchstone" of our inquiry. *Cipollone, supra,* at 516 (internal quotation marks omitted). Because "federal law is said to bar state action in [a] fiel[d] of traditional state regulation," namely, advertising, see *Packer Corp.* v. *Utah,* 285 U. S. 105, 108 (1932), we "wor[k] on the assumption that

the historic police powers of the States [a]re not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress." *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 325 (1997) (internal quotation marks omitted). See also *Medtronic, Inc.* v. *Lohr,* 518 U. S. 470, 475 (1996).

Our analysis begins with the language of the statute. *Hughes Aircraft Co.* v. *Jacobson,* 525 U. S. 432, 438 (1999). In the pre-emption provision, Congress unequivocally precludes the requirement of any additional statements on cigarette packages beyond those provided in § 1333.   15 U. S. C. § 1334(a).   Congress further precludes States or localities from imposing any requirement or prohibition based on smoking and health with respect to the advertising and promotion of cigarettes.   § 1334(b).   Without question, the second clause is more expansive than the first; it employs far more sweeping language to describe the state action that is pre-empted.   We must give meaning to each element of the pre-emption provision.   We are aided in our interpretation by considering the predecessor pre-emption provision and the circumstances in which the current language was adopted.   See *Medtronic, supra,* at 486; *McCarthy* v. *Bronson,* 500 U. S. 136, 139 (1991); *K mart Corp.* v. *Cartier, Inc.,* 486 U. S. 281, 291 (1988).

In 1964, the groundbreaking Report of the Surgeon General's Advisory Committee on Smoking and Health concluded that "[c]igarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action."   Department of Health, Education, and Welfare, U. S. Surgeon General's Advisory Committee, Smoking and Health 33.   In 1965, Congress enacted the FCLAA as a proactive measure in the face of impending regulation by federal agencies and the States.   Pub. L. 89–92, 79 Stat. 282. See also *Cipollone, supra,* at 513–515.   The purpose of the FCLAA was twofold: to inform the public adequately about the hazards of cigarette smoking, and to protect the national

economy from interference due to diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to the relationship between smoking and health. Pub. L. 89–92, § 2. The FCLAA prescribed a label for cigarette packages: "Caution: Cigarette Smoking May Be Hazardous to Your Health." § 4. The FCLAA also required the Secretary of Health, Education, and Welfare (HEW) and the Federal Trade Commission (FTC) to report annually to Congress about the health consequences of smoking and the advertising and promotion of cigarettes. § 5.

Section 5 of the FCLAA included a pre-emption provision in which "Congress spoke precisely and narrowly." *Cipollone, supra,* at 518. Subsection (a) prohibited any requirement of additional statements on cigarette packaging. Subsection (b) provided that "[n]o statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." Section 10 of the FCLAA set a termination date of July 1, 1969, for these provisions. As we have previously explained, "on their face, [the pre-emption] provisions merely prohibited state and federal rulemaking bodies from mandating particular cautionary statements on cigarette labels [subsection (a)] or in cigarette advertisements [subsection (b)]." *Cipollone, supra,* at 518.

The FCLAA was enacted with the expectation that Congress would reexamine it in 1969 in light of the developing information about cigarette smoking and health. H. R. Rep. No. 586, 89th Cong., 1st Sess., 6 (1965); 111 Cong. Rec. 16541 (1965). In the intervening years, Congress received reports and recommendations from the HEW Secretary and the FTC. S. Rep. No. 91–566, pp. 2–6 (1969). The HEW Secretary recommended that Congress strengthen the warning, require the warning on all packages and in advertisements, and publish tar and nicotine levels on packages and in advertisements. *Id.,* at 4. The FTC made similar and additional

recommendations. The FTC sought a complete ban on radio and television advertising, a requirement that broadcasters devote time for health hazard announcements concerning smoking, and increased funding for public education and research about smoking. *Id.*, at 6. The FTC urged Congress not to continue to prevent federal agencies from regulating cigarette advertising. *Id.*, at 10. In addition, the Federal Communications Commission (FCC) had concluded that advertising which promoted the use of cigarettes created a duty in broadcast stations to provide information about the hazards of cigarette smoking. *Id.*, at 6–7.

In 1969, House and Senate committees held hearings about the health effects of cigarette smoking and advertising by the cigarette industry. The bill that emerged from the House of Representatives strengthened the warning and maintained the pre-emption provision. The Senate amended that bill, adding the ban on radio and television advertising, and changing the pre-emption language to its present form. H. R. Conf. Rep. No. 91–897, pp. 4–5 (1970).

The final result was the Public Health Cigarette Smoking Act of 1969, in which Congress, following the Senate's amendments, made three significant changes to the FCLAA. Pub. L. 91–222, § 2, 84 Stat. 87. First, Congress drafted a new label that read: "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health." FCLAA, § 4. Second, Congress declared it unlawful to advertise cigarettes on any medium of electronic communication subject to the jurisdiction of the FCC. § 6. Finally, Congress enacted the current pre-emption provision, which proscribes any "requirement or prohibition based on smoking and health . . . imposed under State law with respect to the advertising or promotion" of cigarettes. § 5(b). The new subsection (b) did not pre-empt regulation by federal agencies, freeing the FTC to impose warning requirements in cigarette advertising. See *Cipollone*, 505 U. S., at 515. The new pre-emption provision, like its predecessor, only applied to cigarettes, and not other tobacco products.

In 1984, Congress again amended the FCLAA in the Comprehensive Smoking Education Act. Pub. L. 98–474, 98 Stat. 2200. The purpose of the Act was to "provide a new strategy for making Americans more aware of any adverse health effects of smoking, to assure the timely and widespread dissemination of research findings and to enable individuals to make informed decisions about smoking." § 2. The Act established a series of warnings to appear on a rotating basis on cigarette packages and in cigarette advertising, § 4, and directed the Health and Human Services Secretary to create and implement an educational program about the health effects of cigarette smoking, § 3.

The FTC has continued to report on trade practices in the cigarette industry. In 1999, the first year since the master settlement agreement, the FTC reported that the cigarette industry expended $8.24 billion on advertising and promotions, the largest expenditure ever. FTC, Cigarette Report for 1999, p. 1 (2000). Substantial increases were found in point-of-sale promotions, payments made to retailers to facilitate sales, and retail offers such as buy one, get one free, or product giveaways. *Id.*, at 4–5. Substantial decreases, however, were reported for outdoor advertising and transit advertising. *Id.*, at 2. Congress and federal agencies continue to monitor advertising and promotion practices in the cigarette industry.

The scope and meaning of the current pre-emption provision become clearer once we consider the original pre-emption language and the amendments to the FCLAA. Without question, "the plain language of the pre-emption provision in the 1969 Act is much broader." *Cipollone*, 505 U. S., at 520. Rather than preventing only "statements," the amended provision reaches all "requirement[s] or prohibition[s] . . . imposed under State law." And, although the former statute reached only statements "in the advertising," the current provision governs "with respect to the advertising or promotion" of cigarettes. See *ibid.* Congress expanded the pre-emption provision with respect to the

States, and at the same time, it allowed the FTC to regulate cigarette advertising. Congress also prohibited cigarette advertising in electronic media altogether. Viewed in light of the context in which the current pre-emption provision was adopted, we must determine whether the FCLAA pre-empts Massachusetts' regulations governing outdoor and point-of-sale advertising of cigarettes.

## B

The Court of Appeals acknowledged that the FCLAA pre-empts any "requirement or prohibition based on smoking and health . . . with respect to the advertising or promotion of . . . cigarettes," 15 U. S. C. § 1334(b), but concluded that the FCLAA does not nullify Massachusetts' cigarette advertising regulations. The court concentrated its analysis on whether the regulations are "with respect to" advertising and promotion, relying on two of its sister Circuits to conclude that the FCLAA only pre-empts regulations of the content of cigarette advertising. The Court of Appeals also reasoned that the Attorney General's regulations are a form of zoning, a traditional area of state power; therefore the presumption against pre-emption applied.

The cigarette petitioners maintain that the Court of Appeals' "with respect to" analysis is inconsistent with the FCLAA's statutory text and legislative history, and gives the States license to prohibit almost all cigarette advertising. Petitioners also maintain that there is no basis for construing the pre-emption provision to prohibit only content-based advertising regulations.

Although they support the Court of Appeals' result, the Attorney General and United States as *amicus curiae* do not fully endorse that court's textual analysis of the pre-emption provision. Instead, they assert that the cigarette advertising regulations are not pre-empted because they are not "based on smoking and health." The Attorney General and

the United States also contend that the regulations are not pre-empted because they do not prescribe the content of cigarette advertising and they fall squarely within the State's traditional powers to control the location of advertising and to protect the welfare of children.

Turning first to the language in the pre-emption provision relied upon by the Court of Appeals, we reject the notion that the Attorney General's cigarette advertising regulations are not "with respect to" advertising and promotion. We disagree with the Court of Appeals' analogy to the Employee Retirement Income Security Act of 1974 (ERISA). In some cases concerning ERISA's pre-emption of state law, the Court has had to decide whether a particular state law "relates to" an employee benefit plan covered by ERISA even though the state law makes no express reference to such a plan. See, *e. g., California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S., at 324–325. Here, however, there is no question about an indirect relationship between the regulations and cigarette advertising because the regulations expressly target cigarette advertising. 940 Code of Mass. Regs. § 21.04(5) (2000).

Before this Court, the Attorney General focuses on a different phrase in the pre-emption provision: "based on smoking and health." The Attorney General argues that the cigarette advertising regulations are not "based on smoking and health," because they do not involve health-related content in cigarette advertising but instead target youth exposure to cigarette advertising. To be sure, Members of this Court have debated the precise meaning of "based on smoking and health," see *Cipollone, supra,* at 529, n. 7 (plurality opinion), but we cannot agree with the Attorney General's narrow construction of the phrase.

As Congress enacted the current pre-emption provision, Congress did not concern itself solely with health warnings for cigarettes. In the 1969 amendments, Congress not only

enhanced its scheme to warn the public about the hazards of cigarette smoking, but also sought to protect the public, including youth, from being inundated with images of cigarette smoking in advertising. In pursuit of the latter goal, Congress banned electronic media advertising of cigarettes. And to the extent that Congress contemplated additional targeted regulation of cigarette advertising, it vested that authority in the FTC.

The context in which Congress crafted the current pre-emption provision leads us to conclude that Congress prohibited state cigarette advertising regulations motivated by concerns about smoking and health. Massachusetts has attempted to address the incidence of underage cigarette smoking by regulating advertising, see 940 Code of Mass. Regs. § 21.01 (2000), much like Congress' ban on cigarette advertising in electronic media. At bottom, the concern about youth exposure to cigarette advertising is intertwined with the concern about cigarette smoking and health. Thus the Attorney General's attempt to distinguish one concern from the other must be rejected.

The Attorney General next claims that the State's outdoor and point-of-sale advertising regulations for cigarettes are not pre-empted because they govern the location, and not the content, of advertising. This is also JUSTICE STEVENS' main point with respect to pre-emption. *Post,* at 595 (opinion concurring in part, concurring in judgment in part, and dissenting in part).

The content versus location distinction has some surface appeal. The pre-emption provision immediately follows the section of the FCLAA that prescribes warnings. See 15 U. S. C. §§ 1333, 1334. The pre-emption provision itself refers to cigarettes "labeled in conformity with" the statute. § 1334(b). But the content/location distinction cannot be squared with the language of the pre-emption provision, which reaches *all* "requirements" and "prohibitions" "imposed under State law." A distinction between the content

of advertising and the location of advertising in the FCLAA also cannot be reconciled with Congress' own location-based restriction, which bans advertising in electronic media, but not elsewhere. See § 1335. We are not at liberty to pick and choose which provisions in the legislative scheme we will consider, see *post*, at 596, n. 5 (opinion of STEVENS, J.), but must examine the FCLAA as a whole.

Moreover, any distinction between the content and location of cigarette advertising collapses once the implications of that approach are fully considered. At oral argument, the Attorney General was pressed to explain what types of state regulations of cigarette advertising, in his view, are pre-empted by the FCLAA. The Attorney General maintained that a state law that required cigarette retailers to remove the word "tobacco" from advertisements, or required cigarette billboards to be blank, would be pre-empted if it were a regulation of "health-related content." Tr. of Oral Arg. 41, 42. The Attorney General also maintained, however, that a complete ban on all cigarette advertising would not be pre-empted because Congress did not intend to invade local control over zoning. *Id.*, at 42–44. The latter position clearly follows from the factual distinction between content and location, but it finds no support in the text of the FCLAA's pre-emption provision. We believe that Congress wished to ensure that "a State could not do through negative mandate (*e. g.*, banning all cigarette advertising) that which it already was forbidden to do through positive mandate (*e. g.*, mandating particular cautionary statements)." *Cipollone*, 505 U. S., at 539 (Blackmun, J., joined by KENNEDY and SOUTER, JJ., concurring in part and dissenting in part). See also *Vango Media, Inc.* v. *New York*, 34 F. 3d 68 (CA2 1994) (holding pre-empted a regulation that required one public health message for every four cigarette advertisements).

JUSTICE STEVENS, *post*, at 595–598, maintains that Congress did not intend to displace state regulation of the location of cigarette advertising. There is a critical distinction,

however, between generally applicable zoning regulations, see *infra*, at 551–552, and regulations targeting cigarette advertising. The latter type of regulation, which is inevitably motivated by concerns about smoking and health, squarely contradicts the FCLAA. The FCLAA's comprehensive warnings, advertising restrictions, and pre-emption provision would make little sense if a State or locality could simply target and ban all cigarette advertising.

JUSTICE STEVENS finds it ironic that we conclude that "federal law precludes States and localities from protecting children from dangerous products within 1,000 feet of a school," in light of our prior conclusion that the "Federal Government lacks the constitutional authority to impose a similarly motivated ban" in *United States* v. *Lopez,* 514 U. S. 549 (1995). *Post,* at 598–599, n. 8. Our holding is not as broad as JUSTICE STEVENS states; we hold only that the FCLAA pre-empts state regulations targeting cigarette advertising. States remain free to enact generally applicable zoning regulations, and to regulate conduct with respect to cigarette use and sales. *Infra,* at 552. The reference to *Lopez* is also inapposite. In *Lopez,* we held that Congress exceeded the limits of its Commerce Clause power in the Gun-Free School Zones Act of 1990, which made it a federal crime to possess a firearm in a school zone. 514 U. S., at 553–568. These cases, by contrast, concern the Supremacy Clause and the doctrine of pre-emption as applied in a case where Congress expressly precluded certain state regulations of cigarette advertising. Massachusetts did not raise a constitutional challenge to the FCLAA, and we are not confronted with whether Congress exceeded its constitutionally delegated authority in enacting the FCLAA.

In sum, we fail to see how the FCLAA and its pre-emption provision permit a distinction between the specific concern about minors and cigarette advertising and the more general concern about smoking and health in cigarette advertising, especially in light of the fact that Congress crafted a legisla-

tive solution for those very concerns. We also conclude that a distinction between state regulation of the location as opposed to the content of cigarette advertising has no foundation in the text of the pre-emption provision. Congress pre-empted state cigarette advertising regulations like the Attorney General's because they would upset federal legislative choices to require specific warnings and to impose the ban on cigarette advertising in electronic media in order to address concerns about smoking and health. Accordingly, we hold that the Attorney General's outdoor and point-of-sale advertising regulations targeting cigarettes are pre-empted by the FCLAA.

## C

Although the FCLAA prevents States and localities from imposing special requirements or prohibitions "based on smoking and health" "with respect to the advertising or promotion" of cigarettes, that language still leaves significant power in the hands of States to impose generally applicable zoning regulations and to regulate conduct. As we noted in *Cipollone*, "each phrase within [the provision] limits the universe of [state action] pre-empted by the statute." 505 U. S., at 524 (plurality opinion).

For instance, the FCLAA does not restrict a State or locality's ability to enact generally applicable zoning restrictions. We have recognized that state interests in traffic safety and esthetics may justify zoning regulations for advertising. See *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 507–508 (1981). See also *St. Louis Poster Advertising Co.* v. *St. Louis*, 249 U. S. 269, 274 (1919); *Thomas Cusack Co.* v. *Chicago*, 242 U. S. 526, 529–531 (1917). Although Congress has taken into account the unique concerns about cigarette smoking and health in advertising, there is no indication that Congress intended to displace local community interests in general regulations of the location of billboards or large marquee advertising, or that Congress intended cigarette advertisers to be afforded special treatment in that regard. Re-

strictions on the location and size of advertisements that apply to cigarettes on equal terms with other products appear to be outside the ambit of the pre-emption provision. Such restrictions are not "based on smoking and health."

The FCLAA also does not foreclose all state regulation of conduct as it relates to the sale or use of cigarettes. The FCLAA's pre-emption provision explicitly governs state regulations of "advertising or promotion."* Accordingly, the FCLAA does not pre-empt state laws prohibiting cigarette sales to minors. To the contrary, there is an established congressional policy that supports such laws; Congress has required States to prohibit tobacco sales to minors as a condition of receiving federal block grant funding for substance abuse treatment activities. 106 Stat. 394, 388, 42 U. S. C. §§ 300x–26(a)(1), 300x–21.

In Massachusetts, it is illegal to sell or distribute tobacco products to persons under the age of 18. Mass. Gen. Laws, ch. 270, § 6 (2000). Having prohibited the sale and distribution of tobacco products to minors, the State may prohibit common inchoate offenses that attach to criminal conduct, such as solicitation, conspiracy, and attempt. Cf. *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of New York,* 447 U. S., at 563–564; *Carey* v. *Population Servs. Int'l,* 431 U. S. 678, 701 (1977); *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 772 (1976); 60 Fed. Reg. 41330–41332 (1995) (citing evidence that industry may be attempting to induce individuals under 18 to smoke cigarettes). States and localities also have at their disposal other means of regulating conduct to ensure that minors do not obtain cigarettes. See Part III–D, *infra.*

---

*The Senate Report explained that the pre-emption provision "would in no way affect the power of any State or political subdivision of any State with respect to the taxation or the sale of cigarettes to minors, or the prohibition of smoking in public buildings, or similar police regulations. It is limited entirely to State or local requirements or prohibitions in the advertising of cigarettes." S. Rep. No. 91–566, p. 12 (1969).

## D

The smokeless tobacco petitioners argue that if the State's outdoor and point-of-sale advertising regulations for cigarettes are pre-empted, then the same advertising regulations with respect to smokeless tobacco must be invalidated because they cannot be severed from the cigarette provisions. Brief for Petitioner U. S. Smokeless Tobacco Co. in Nos. 00–596 and 00–597, p. 4, n. 5. The District Court did not reach the severability issue with respect to the advertising provisions that are before this Court. 76 F. Supp. 2d, at 134, n. 11. The Court of Appeals also did not reach severability because that court likewise concluded that the cigarette advertising regulations were not pre-empted. 218 F. 3d, at 37, n. 3. We decline to reach an issue that was not decided below. *National Collegiate Athletic Assn.* v. *Smith,* 525 U. S. 459, 470 (1999).

## III

By its terms, the FCLAA's pre-emption provision only applies to cigarettes. Accordingly, we must evaluate the smokeless tobacco and cigar petitioners' First Amendment challenges to the State's outdoor and point-of-sale advertising regulations. The cigarette petitioners did not raise a pre-emption challenge to the sales practices regulations. Thus, we must analyze the cigarette as well as the smokeless tobacco and cigar petitioners' claim that certain sales practices regulations for tobacco products violate the First Amendment.

## A

For over 25 years, the Court has recognized that commercial speech does not fall outside the purview of the First Amendment. See, *e. g., Virginia Bd. of Pharmacy, supra,* at 762. Instead, the Court has afforded commercial speech a measure of First Amendment protection " 'commensurate' " with its position in relation to other constitutionally guaranteed expression. See, *e. g., Florida Bar* v. *Went For It, Inc.,*

515 U. S. 618, 623 (1995) (quoting *Board of Trustees of State Univ. of N. Y. v. Fox,* 492 U. S. 469, 477 (1989)). In recognition of the "distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech," *Central Hudson, supra,* at 562 (internal quotation marks omitted), we developed a framework for analyzing regulations of commercial speech that is "substantially similar" to the test for time, place, and manner restrictions, *Board of Trustees of State Univ. of N. Y. v. Fox, supra,* at 477. The analysis contains four elements:

> "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Central Hudson, supra,* at 566.

Petitioners urge us to reject the *Central Hudson* analysis and apply strict scrutiny. They are not the first litigants to do so. See, *e. g., Greater New Orleans Broadcasting Assn., Inc. v. United States,* 527 U. S. 173, 184 (1999). Admittedly, several Members of the Court have expressed doubts about the *Central Hudson* analysis and whether it should apply in particular cases. See, *e. g., Greater New Orleans, supra,* at 197 (THOMAS, J., concurring in judgment); *44 Liquormart, Inc. v. Rhode Island,* 517 U. S. 484, 501, 510–514 (1996) (joint opinion of STEVENS, KENNEDY, and GINSBURG, JJ.); *id.,* at 517 (SCALIA, J., concurring in part and concurring in judgment); *id.,* at 518 (THOMAS, J., concurring in part and concurring in judgment). But here, as in *Greater New Orleans,* we see "no need to break new ground. *Central Hudson,* as

applied in our more recent commercial speech cases, provides an adequate basis for decision." 527 U. S., at 184.

Only the last two steps of *Central Hudson*'s four-part analysis are at issue here. The Attorney General has assumed for purposes of summary judgment that petitioners' speech is entitled to First Amendment protection. 218 F. 3d, at 43; 84 F. Supp. 2d, at 185–186. With respect to the second step, none of the petitioners contests the importance of the State's interest in preventing the use of tobacco products by minors. Brief for Petitioners Lorillard Tobacco Co. et al. in No. 00–596, p. 41; Brief for Petitioner U. S. Smokeless Tobacco Co. in Nos. 00–596 and 00–597, at 16; Brief for Petitioners Altadis U. S. A. Inc. et al. in No. 00–597, p. 8.

The third step of *Central Hudson* concerns the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest. It requires that

> "the speech restriction directly and materially advanc[e] the asserted governmental interest. 'This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Greater New Orleans, supra,* at 188 (quoting *Edenfield* v. *Fane,* 507 U. S. 761, 770–771 (1993)).

We do not, however, require that "empirical data come . . . accompanied by a surfeit of background information. . . . [W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.'" *Florida Bar* v. *Went For It, Inc., supra,* at 628 (citations and internal quotation marks omitted).

The last step of the *Central Hudson* analysis "complements" the third step, "asking whether the speech restriction is not more extensive than necessary to serve the interests that support it." *Greater New Orleans, supra,* at 188. We have made it clear that "the least restrictive means" is not the standard; instead, the case law requires a reasonable " 'fit between the legislature's ends and the means chosen to accomplish those ends, . . . a means narrowly tailored to achieve the desired objective.' " *Went For It, Inc., supra,* at 632 (quoting *Board of Trustees of State Univ. of N. Y. v. Fox, supra,* at 480). Focusing on the third and fourth steps of the *Central Hudson* analysis, we first address the outdoor advertising and point-of-sale advertising regulations for smokeless tobacco and cigars. We then address the sales practices regulations for all tobacco products.

## B

The outdoor advertising regulations prohibit smokeless tobacco or cigar advertising within a 1,000-foot radius of a school or playground. 940 Code of Mass. Regs. §§ 21.04(5)(a), 22.06(5)(a) (2000). The District Court and Court of Appeals concluded that the Attorney General had identified a real problem with underage use of tobacco products, that limiting youth exposure to advertising would combat that problem, and that the regulations burdened no more speech than necessary to accomplish the State's goal. 218 F. 3d, at 44–53; 84 F. Supp. 2d, at 186–193. The smokeless tobacco and cigar petitioners take issue with all of these conclusions.

### 1

The smokeless tobacco and cigar petitioners contend that the Attorney General's regulations do not satisfy *Central Hudson*'s third step. They maintain that although the Attorney General may have identified a problem with underage cigarette smoking, he has not identified an equally severe problem with respect to underage use of smokeless tobacco

or cigars. The smokeless tobacco petitioner emphasizes the "lack of parity" between cigarettes and smokeless tobacco. Brief for Petitioner U. S. Smokeless Tobacco Co. in Nos. 00–596 and 00–597, at 19; Reply Brief for Petitioner U. S. Smokeless Tobacco Co. in Nos. 00–596 and 00–597, pp. 4, 10–11. The cigar petitioners catalog a list of differences between cigars and other tobacco products, including the characteristics of the products and marketing strategies. Brief for Petitioners Altadis U. S. A. Inc. et al. in No. 00–597, at 9–11. The petitioners finally contend that the Attorney General cannot prove that advertising has a causal link to tobacco use such that limiting advertising will materially alleviate any problem of underage use of their products. Brief for Petitioner U. S. Smokeless Tobacco Co. in Nos. 00–596 and 00–597, at 20–22; Brief for Petitioners Altadis U. S. A. Inc. et al. in No. 00–597, at 9–16.

In previous cases, we have acknowledged the theory that product advertising stimulates demand for products, while suppressed advertising may have the opposite effect. See *Rubin,* 514 U. S., at 487; *United States* v. *Edge Broadcasting Co.,* 509 U. S. 418, 434 (1993); *Central Hudson,* 447 U. S., at 568–569. The Attorney General cites numerous studies to support this theory in the case of tobacco products.

The Attorney General relies in part on evidence gathered by the Food and Drug Administration (FDA) in its attempt to regulate the advertising of cigarettes and smokeless tobacco. See Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco Products to Protect Children and Adolescents, FDA Proposed Rule, 60 Fed. Reg. 41314 (1995); Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco to Protect Children and Adolescents, FDA Final Rule, 61 Fed. Reg. 44396 (1996). The FDA promulgated the advertising regulations after finding that the period prior to adulthood is when an overwhelming majority of Americans first decide to use tobacco products, and that advertising plays a crucial

role in that decision. *Id.*, at 44398–44399. We later held that the FDA lacks statutory authority to regulate tobacco products. See *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120 (2000). Nevertheless, the Attorney General relies on the FDA's proceedings and other studies to support his decision that advertising affects demand for tobacco products. Cf. *Erie* v. *Pap's A. M.*, 529 U. S. 277, 296 (2000) (plurality opinion) (cities and localities may rely on evidence from other jurisdictions to demonstrate harmful secondary effects of adult entertainment and to justify regulation); *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560, 583–584 (1991) (SOUTER, J., concurring in judgment) (same); *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 50–52 (1986) (same). See also *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 393, and n. 6 (2000) (discussing evidence of corruption and the appearance of corruption in campaign finance).

In its rulemaking proceeding, the FDA considered several studies of tobacco advertising and trends in the use of various tobacco products. The Surgeon General's report and the Institute of Medicine's report found that "there is sufficient evidence to conclude that advertising and labeling play a significant and important contributory role in a young person's decision to use cigarettes or smokeless tobacco products." 60 Fed. Reg. 41332. See also Pierce et al., Tobacco Industry Promotion of Cigarettes and Adolescent Smoking, 279 JAMA 511, 514 (1998).

For instance, children smoke fewer brands of cigarettes than adults, and those choices directly track the most heavily advertised brands, unlike adult choices, which are more dispersed and related to pricing. FDA Proposed Rule, 60 Fed. Reg. 41332. Another study revealed that 72% of 6 year olds and 52% of children ages 3 to 6 recognized "Joe Camel," the cartoon anthropomorphic symbol of R. J. Reynolds' Camel brand cigarettes. *Id.*, at 41333. After the introduction of Joe Camel, Camel cigarettes' share of the youth market rose from 4% to 13%. *Id.*, at 41330. The FDA also identified

trends in tobacco consumption among certain populations, such as young women, that correlated to the introduction and marketing of products geared toward that population. *Id.*, at 41333.

The FDA also made specific findings with respect to smokeless tobacco. The FDA concluded that "[t]he recent and very large increase in the use of smokeless tobacco products by young people and the addictive nature of these products has persuaded the agency that these products must be included in any regulatory approach that is designed to help prevent future generations of young people from becoming addicted to nicotine-containing tobacco products." *Id.*, at 41318. Studies have analyzed smokeless tobacco use by young people, discussing trends based on gender, school grade, and locale. See, *e. g.*, Boyd et al., Use of Smokeless Tobacco among Children and Adolescents in the United States, 16 Preventative Medicine 402–418 (1987), Record, Doc. No. 38, Exh. 63.

Researchers tracked a dramatic shift in patterns of smokeless tobacco use from older to younger users over the past 30 years. See, *e. g.*, FDA Proposed Rule, 60 Fed. Reg. 41317; Tomar, Giovano, & Erickson, Smokeless tobacco brand preference and brand switching among US adolescents and young adults, 4 Tobacco Control 67 (1995), Record, Doc. No. 38, Exh. 62; Department of Health and Human Services, Preventing Tobacco Use Among Young People: A Report of the Surgeon General 163 (1994), Record, Doc. No. 36, Exh. 1. In particular, the smokeless tobacco industry boosted sales tenfold in the 1970's and 1980's by targeting young males. FDA Proposed Rule, 60 Fed. Reg. 41331. See also National Cancer Institute, Cigars: Health Effects and Trends, Smoking and Tobacco Control Monograph No. 9, p. 16 (1998), Record, Doc. No. 39, Exh. 67. Another study documented the targeting of youth through smokeless tobacco sales and advertising techniques. Ernster, Advertising and Promotion of Smokeless Tobacco Products, National Cancer Institute

Monograph No. 8, pp. 87–93 (1989), Record, Doc. No. 38, Exh. 66.

The Attorney General presents different evidence with respect to cigars. There was no data on underage cigar use prior to 1996 because the behavior was considered "uncommon enough not to be worthy of examination." Smoking and Tobacco Control Monograph No. 9, at 13; FTC Report to Congress: Cigar Sales and Advertising and Promotional Expenses for Calendar Years 1996 and 1997, p. 9 (1999), Record, Doc. No. 39, Exh. 71. In 1995, the FDA decided not to include cigars in its attempted regulation of tobacco product advertising, explaining that "the agency does not currently have sufficient evidence that these products are drug delivery devices . . . . FDA has focused its investigation of its authority over tobacco products on cigarettes and smokeless tobacco products, and not on pipe tobacco or cigars, because young people predominantly use cigarettes and smokeless tobacco products." 60 Fed. Reg. 41322.

More recently, however, data on youth cigar use has emerged. The National Cancer Institute concluded in its 1998 Monograph that the rate of cigar use by minors is increasing and that, in some States, the cigar use rates are higher than the smokeless tobacco use rates for minors. Smoking and Tobacco Control Monograph No. 9, at 19, 42–51. In its 1999 Report to Congress, the FTC concluded that "substantial numbers of adolescents are trying cigars." FTC Report to Congress, at 9. See also Department of Health and Human Services, Office of Inspector General, Youth Use of Cigars: Patterns of Use and Perceptions of Risk (1999), Record, Doc. No. 39, Exh. 78.

Studies have also demonstrated a link between advertising and demand for cigars. After Congress recognized the power of images in advertising and banned cigarette advertising in electronic media, television advertising of small cigars "increased dramatically in 1972 and 1973," "filled the void left by cigarette advertisers," and "sales . . . soared."

Smoking and Tobacco Control Monograph No. 9, at 24. In 1973, Congress extended the electronic media advertising ban for cigarettes to little cigars. Little Cigar Act, Pub. L. 93–109, § 3, 87 Stat. 352, as amended, 15 U. S. C. § 1335. In the 1990's, cigar advertising campaigns triggered a boost in sales. Smoking and Tobacco Control Monograph No. 9, at 215.

Our review of the record reveals that the Attorney General has provided ample documentation of the problem with underage use of smokeless tobacco and cigars. In addition, we disagree with petitioners' claim that there is no evidence that preventing targeted campaigns and limiting youth exposure to advertising will decrease underage use of smokeless tobacco and cigars. On this record and in the posture of summary judgment, we are unable to conclude that the Attorney General's decision to regulate advertising of smokeless tobacco and cigars in an effort to combat the use of tobacco products by minors was based on mere "speculation [and] conjecture." *Edenfield* v. *Fane,* 507 U. S., at 770.

### 2

Whatever the strength of the Attorney General's evidence to justify the outdoor advertising regulations, however, we conclude that the regulations do not satisfy the fourth step of the *Central Hudson* analysis. The final step of the *Central Hudson* analysis, the "critical inquiry in this case," requires a reasonable fit between the means and ends of the regulatory scheme. 447 U. S., at 569. The Attorney General's regulations do not meet this standard. The broad sweep of the regulations indicates that the Attorney General did not "carefully calculat[e] the costs and benefits associated with the burden on speech imposed" by the regulations. *Cincinnati* v. *Discovery Network, Inc.,* 507 U. S. 410, 417 (1993) (internal quotation marks omitted).

The outdoor advertising regulations prohibit any smokeless tobacco or cigar advertising within 1,000 feet of schools

or playgrounds. In the District Court, petitioners maintained that this prohibition would prevent advertising in 87% to 91% of Boston, Worcester, and Springfield, Massachusetts. 84 F. Supp. 2d, at 191. The 87% to 91% figure appears to include not only the effect of the regulations, but also the limitations imposed by other generally applicable zoning restrictions. See App. 161–167. The Attorney General disputed petitioners' figures but "concede[d] that the reach of the regulations is substantial." 218 F. 3d, at 50. Thus, the Court of Appeals concluded that the regulations prohibit advertising in a substantial portion of the major metropolitan areas of Massachusetts. *Ibid.*

The substantial geographical reach of the Attorney General's outdoor advertising regulations is compounded by other factors. "Outdoor" advertising includes not only advertising located outside an establishment, but also advertising inside a store if that advertising is visible from outside the store. The regulations restrict advertisements of any size and the term advertisement also includes oral statements. 940 Code of Mass. Regs. §§ 21.03, 22.03 (2000).

In some geographical areas, these regulations would constitute nearly a complete ban on the communication of truthful information about smokeless tobacco and cigars to adult consumers. The breadth and scope of the regulations, and the process by which the Attorney General adopted the regulations, do not demonstrate a careful calculation of the speech interests involved.

First, the Attorney General did not seem to consider the impact of the 1,000-foot restriction on commercial speech in major metropolitan areas. The Attorney General apparently selected the 1,000-foot distance based on the FDA's decision to impose an identical 1,000-foot restriction when it attempted to regulate cigarette and smokeless tobacco advertising. See FDA Final Rule, 61 Fed. Reg. 44399; Brief for Respondents 45, and n. 23. But the FDA's 1,000-foot regulation was not an adequate basis for the Attorney Gen-

eral to tailor the Massachusetts regulations. The degree to which speech is suppressed—or alternative avenues for speech remain available—under a particular regulatory scheme tends to be case specific. See, e. g., *Renton*, 475 U. S., at 53–54. And a case specific analysis makes sense, for although a State or locality may have common interests and concerns about underage smoking and the effects of tobacco advertisements, the impact of a restriction on speech will undoubtedly vary from place to place. The FDA's regulations would have had widely disparate effects nationwide. Even in Massachusetts, the effect of the Attorney General's speech regulations will vary based on whether a locale is rural, suburban, or urban. The uniformly broad sweep of the geographical limitation demonstrates a lack of tailoring.

In addition, the range of communications restricted seems unduly broad. For instance, it is not clear from the regulatory scheme why a ban on oral communications is necessary to further the State's interest. Apparently that restriction means that a retailer is unable to answer inquiries about its tobacco products if that communication occurs outdoors. Similarly, a ban on all signs of any size seems ill suited to target the problem of highly visible billboards, as opposed to smaller signs. To the extent that studies have identified particular advertising and promotion practices that appeal to youth, tailoring would involve targeting those practices while permitting others. As crafted, the regulations make no distinction among practices on this basis.

The Court of Appeals recognized that the smokeless tobacco and cigar petitioners' concern about the amount of speech restricted was "valid," but reasoned that there was an "obvious connection to the state's interest in protecting minors." 218 F. 3d, at 50. Even on the premise that Massachusetts has demonstrated a connection between the outdoor advertising regulations and its substantial interest in preventing underage tobacco use, the question of tailoring re-

mains. The Court of Appeals failed to follow through with an analysis of the countervailing First Amendment interests.

The State's interest in preventing underage tobacco use is substantial, and even compelling, but it is no less true that the sale and use of tobacco products by adults is a legal activity. We must consider that tobacco retailers and manufacturers have an interest in conveying truthful information about their products to adults, and adults have a corresponding interest in receiving truthful information about tobacco products. In a case involving indecent speech on the Internet we explained that "the governmental interest in protecting children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults." *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 875 (1997) (citations omitted). See, *e. g., Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 74 (1983) ("The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox"); *Butler* v. *Michigan*, 352 U. S. 380, 383 (1957) ("The incidence of this enactment is to reduce the adult population . . . to reading only what is fit for children"). As the State protects children from tobacco advertisements, tobacco manufacturers and retailers and their adult consumers still have a protected interest in communication. Cf. *American Civil Liberties Union, supra*, at 886–889 (O'CONNOR, J., concurring in judgment in part and dissenting in part) (discussing the creation of "adult zones" on the Internet).

In some instances, Massachusetts' outdoor advertising regulations would impose particularly onerous burdens on speech. For example, we disagree with the Court of Appeals' conclusion that because cigar manufacturers and retailers conduct a limited amount of advertising in comparison to other tobacco products, "the relative lack of cigar advertising also means that the burden imposed on cigar advertisers is correspondingly small." 218 F. 3d, at 49. If some retailers have relatively small advertising budgets, and use

few avenues of communication, then the Attorney General's outdoor advertising regulations potentially place a greater, not lesser, burden on those retailers' speech. Furthermore, to the extent that cigar products and cigar advertising differ from that of other tobacco products, that difference should inform the inquiry into what speech restrictions are necessary.

In addition, a retailer in Massachusetts may have no means of communicating to passersby on the street that it sells tobacco products because alternative forms of advertisement, like newspapers, do not allow that retailer to propose an instant transaction in the way that onsite advertising does. The ban on any indoor advertising that is visible from the outside also presents problems in establishments like convenience stores, which have unique security concerns that counsel in favor of full visibility of the store from the outside. It is these sorts of considerations that the Attorney General failed to incorporate into the regulatory scheme.

We conclude that the Attorney General has failed to show that the outdoor advertising regulations for smokeless tobacco and cigars are not more extensive than necessary to advance the State's substantial interest in preventing underage tobacco use. JUSTICE STEVENS urges that the Court remand the case for further development of the factual record. *Post*, at 601–603. We believe that a remand is inappropriate in these cases because the State had ample opportunity to develop a record with respect to tailoring (as it had to justify its decision to regulate advertising), and additional evidence would not alter the nature of the scheme before the Court. See *Greater New Orleans*, 527 U. S., at 189, n. 6.

A careful calculation of the costs of a speech regulation does not mean that a State must demonstrate that there is no incursion on legitimate speech interests, but a speech regulation cannot unduly impinge on the speaker's ability to propose a commercial transaction and the adult listener's opportunity to obtain information about products. After

reviewing the outdoor advertising regulations, we find the calculation in these cases insufficient for purposes of the First Amendment.

## C

Massachusetts has also restricted indoor, point-of-sale advertising for smokeless tobacco and cigars. Advertising cannot be "placed lower than five feet from the floor of any retail establishment which is located within a one thousand foot radius of" any school or playground. 940 Code of Mass. Regs. §§ 21.04(5)(b), 22.06(5)(b) (2000). The District Court invalidated these provisions, concluding that the Attorney General had not provided a sufficient basis for regulating indoor advertising. 84 F. Supp. 2d, at 192–193, 195. The Court of Appeals reversed. 218 F. 3d, at 50–51. The court explained: "We do have some misgivings about the effectiveness of a restriction that is based on the assumption that minors under five feet tall will not, or will less frequently, raise their view above eye-level, but we find that such [a] determination falls within that range of reasonableness in which the Attorney General is best suited to pass judgment." *Id.*, at 51.

We conclude that the point-of-sale advertising regulations fail both the third and fourth steps of the *Central Hudson* analysis. A regulation cannot be sustained if it "'provides only ineffective or remote support for the government's purpose,'" *Edenfield*, 507 U. S., at 770 (quoting *Central Hudson*, 447 U. S., at 564), or if there is "little chance" that the restriction will advance the State's goal, *Greater New Orleans, supra*, at 193 (internal quotation marks omitted). As outlined above, the State's goal is to prevent minors from using tobacco products and to curb demand for that activity by limiting youth exposure to advertising. The 5-foot rule does not seem to advance that goal. Not all children are less than 5 feet tall, and those who are certainly have the ability to look up and take in their surroundings.

By contrast to JUSTICE STEVENS, *post*, at 604–605, we do not believe this regulation can be construed as a mere regulation of conduct under *United States* v. *O'Brien*, 391 U. S. 367 (1968). To qualify as a regulation of communicative action governed by the scrutiny outlined in *O'Brien*, the State's regulation must be unrelated to expression. *Texas* v. *Johnson*, 491 U. S. 397, 403 (1989). See also *Erie* v. *Pap's A. M.*, 529 U. S., at 289–296 (plurality opinion). Here, Massachusetts' height restriction is an attempt to regulate directly the communicative impact of indoor advertising.

Massachusetts may wish to target tobacco advertisements and displays that entice children, much like floor-level candy displays in a convenience store, but the blanket height restriction does not constitute a reasonable fit with that goal. The Court of Appeals recognized that the efficacy of the regulation was questionable, but decided that, "[i]n any event, the burden on speech imposed by the provision is very limited." 218 F. 3d, at 51. There is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification. We conclude that the restriction on the height of indoor advertising is invalid under *Central Hudson*'s third and fourth prongs.

### D

The Attorney General also promulgated a number of regulations that restrict sales practices by cigarette, smokeless tobacco, and cigar manufacturers and retailers. Among other restrictions, the regulations bar the use of self-service displays and require that tobacco products be placed out of the reach of all consumers in a location accessible only to salespersons. 940 Code of Mass. Regs. §§ 21.04(2)(c)–(d), 22.06(2)(c)–(d) (2000). The cigarette petitioners do not challenge the sales practices regulations on pre-emption grounds. Brief for Petitioners Lorillard Tobacco Co. et al. in No. 00–596, at 5, n. 2. Two of the cigarette petitioners (Brown & Williamson Tobacco Corporation and Lorillard Tobacco Company), petitioner U. S. Smokeless Tobacco Com-

pany, and the cigar petitioners challenge the sales practices regulations on First Amendment grounds. The cigar petitioners additionally challenge a provision that prohibits sampling or promotional giveaways of cigars or little cigars. 940 Code of Mass. Regs. § 22.06(1)(a) (2000).

The District Court concluded that these restrictions implicate no cognizable speech interest, 84 F. Supp. 2d, at 195–196, but the Court of Appeals did not fully adopt that reasoning. The Court of Appeals recognized that self-service displays "often do have some communicative commercial function," but noted that the restriction in the regulations "is not on speech, but rather on the physical location of actual tobacco products." 218 F. 3d, at 53. The court reasoned that nothing in the regulations would prevent the display of empty tobacco product containers, so long as no actual tobacco product was displayed, much like movie jackets at a video store. *Ibid.* With respect to cigar products, the court observed that retailers traditionally allow access to those products, so that the consumer may make a selection on the basis of a number of objective and subjective factors including the aroma and feel of the cigars. *Ibid.* Even assuming a speech interest, however, the court concluded that the regulations were narrowly tailored to serve the State's substantial interest in preventing access to tobacco products by minors. *Id.*, at 54. The court also noted that the restrictions do not apply to adult-only establishments. *Ibid.*

Petitioners devoted little of their briefing to the sales practices regulations, and our understanding of the regulations is accordingly limited by the parties' submissions. As we read the regulations, they basically require tobacco retailers to place tobacco products behind counters and require customers to have contact with a salesperson before they are able to handle a tobacco product.

The cigarette and smokeless tobacco petitioners contend that "the same First Amendment principles that require invalidation of the outdoor and indoor advertising restrictions

require invalidation of the display regulations at issue in this case." Brief for Petitioners Lorillard Tobacco Co. et al. in No. 00–596, at 46, n. 7. See also Reply Brief for Petitioner U. S. Smokeless Tobacco Co. in Nos. 00–596 and 00–597, at 12, n. 7. The cigar petitioners contend that self-service displays for cigars cannot be prohibited because each brand of cigar is unique and customers traditionally have sought to handle and compare cigars at the time of purchase. Brief for Petitioners Altadis U. S. A. Inc. et al. in No. 00–597, at 23, n. 9; Reply Brief for Petitioners Altadis U. S. A. Inc. et al. in No. 00–597, p. 10, n. 7.

We reject these contentions. Assuming that petitioners have a cognizable speech interest in a particular means of displaying their products, cf. *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410 (1993) (distribution of a magazine through newsracks), these regulations withstand First Amendment scrutiny.

Massachusetts' sales practices provisions regulate conduct that may have a communicative component, but Massachusetts seeks to regulate the placement of tobacco products for reasons unrelated to the communication of ideas. See *O'Brien, supra,* at 382. See also *Pap's A. M.,* 529 U. S., at 289 (plurality opinion); *id.,* at 310 (SOUTER, J., concurring in part and dissenting in part); *Johnson, supra,* at 403. We conclude that the State has demonstrated a substantial interest in preventing access to tobacco products by minors and has adopted an appropriately narrow means of advancing that interest. See *O'Brien, supra,* at 382.

Unattended displays of tobacco products present an opportunity for access without the proper age verification required by law. Thus, the State prohibits self-service and other displays that would allow an individual to obtain tobacco products without direct contact with a salesperson. It is clear that the regulations leave open ample channels of communication. The regulations do not significantly impede adult access to tobacco products. Moreover, retailers have other

means of exercising any cognizable speech interest in the presentation of their products. We presume that vendors may place empty tobacco packaging on open display, and display actual tobacco products so long as that display is only accessible to sales personnel. As for cigars, there is no indication in the regulations that a customer is unable to examine a cigar prior to purchase, so long as that examination takes place through a salesperson.

The cigar petitioners also list Massachusetts' prohibition on sampling and free giveaways among the regulations they challenge on First Amendment grounds. See 940 Code of Mass. Regs. § 22.06(1)(a) (2000); Brief for Petitioners Altadis U. S. A. Inc. et al. in No. 00–597, at 2. At no point in their briefs or at oral argument, however, did the cigar petitioners argue the merits of their First Amendment claim with respect to the sampling and giveaway regulation. We decline to address an issue that was not sufficiently briefed and argued before this Court. See *Northwest Airlines, Inc.* v. *County of Kent*, 510 U. S. 355, 366, n. 10 (1994); *Williams* v. *United States*, 503 U. S. 193, 206 (1992); *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 38–40 (1989).

We conclude that the sales practices regulations withstand First Amendment scrutiny. The means chosen by the State are narrowly tailored to prevent access to tobacco products by minors, are unrelated to expression, and leave open alternative avenues for vendors to convey information about products and for would-be customers to inspect products before purchase.

## IV

We have observed that "tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States." *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S., at 161. From a policy perspective, it is understandable for the States to attempt to prevent minors from using tobacco products before they reach an age where they are capable of weighing

for themselves the risks and potential benefits of tobacco use, and other adult activities. Federal law, however, places limits on policy choices available to the States.

In these cases, Congress enacted a comprehensive scheme to address cigarette smoking and health in advertising and pre-empted state regulation of cigarette advertising that attempts to address that same concern, even with respect to youth. The First Amendment also constrains state efforts to limit advertising of tobacco products, because so long as the sale and use of tobacco is lawful for adults, the tobacco industry has a protected interest in communicating information about its products and adult customers have an interest in receiving that information.

To the extent that federal law and the First Amendment do not prohibit state action, States and localities remain free to combat the problem of underage tobacco use by appropriate means. The judgment of the United States Court of Appeals for the First Circuit is therefore affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, with whom JUSTICE SCALIA joins, concurring in part and concurring in the judgment.

The obvious overbreadth of the outdoor advertising restrictions suffices to invalidate them under the fourth part of the test in *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980). As a result, in my view, there is no need to consider whether the restrictions satisfy the third part of the test, a proposition about which there is considerable doubt. Cf. *post,* at 583–584 (THOMAS, J., concurring in part and concurring in judgment). Neither are we required to consider whether *Central Hudson* should be retained in the face of the substantial objections that can be made to it. See *post,* at 574–582 (opinion of THOMAS, J.). My continuing concerns that the test gives

insufficient protection to truthful, nonmisleading commercial speech require me to refrain from expressing agreement with the Court's application of the third part of *Central Hudson.* See, *e. g., 44 Liquormart, Inc.* v. *Rhode Island,* 517 U. S. 484, 501–504 (1996) (opinion of STEVENS, J., joined by KENNEDY and GINSBURG, JJ.). With the exception of Part III–B–1, then, I join the opinion of the Court.

JUSTICE THOMAS, concurring in part and concurring in the judgment.

I join the opinion of the Court (with the exception of Part III–B–1) because I agree that the Massachusetts cigarette advertising regulations are pre-empted by the Federal Cigarette Labeling and Advertising Act, 15 U. S. C. § 1331 *et seq.* I also agree with the Court's disposition of the First Amendment challenges to the other regulations at issue here, and I share the Court's view that the regulations fail even the intermediate scrutiny of *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 557 (1980). At the same time, I continue to believe that when the government seeks to restrict truthful speech in order to suppress the ideas it conveys, strict scrutiny is appropriate, whether or not the speech in question may be characterized as "commercial." See *44 Liquormart, Inc.* v. *Rhode Island,* 517 U. S. 484, 518 (1996) (THOMAS, J., concurring in part and concurring in judgment). I would subject all of the advertising restrictions to strict scrutiny and would hold that they violate the First Amendment.

I

At the heart of this litigation is a Massachusetts regulation that imposes a sweeping ban on speech about tobacco products. 940 Code of Mass. Regs. § 21.04(5) (2000), which governs cigarettes and smokeless tobacco, and § 22.06(5), which governs cigars, prohibit all outdoor advertising, all indoor advertising that can be seen from outdoors, and all point-of-sale advertising (even if not visible from outdoors) that is

lower than five feet from the floor.[1]   These restrictions are superficially limited in their geographic scope: They apply only within 1,000 feet of "any public playground, playground area in a public park, elementary school or secondary school." § 21.04(5)(a).   But the Court of Appeals acknowledged that the zone of prohibition covers as much as 90 percent of the three largest cities in Massachusetts, *Consolidated Cigar Corp.* v. *Reilly*, 218 F. 3d 30, 50 (CA1 2000), so the practical effect is little different from that of a total ban. Cf. *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 812 (2000) ("The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans").

Respondents suggest in passing that the regulations are "zoning-type restrictions" that should receive "the intermediate level of scrutiny traditionally associated with various forms of 'time, place, and manner' regulations."   Brief for Respondents 31.   We have indeed upheld time, place, and manner regulations that prohibited certain kinds of outdoor signs, see, *e. g.*, *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789 (1984), and we have similarly upheld zoning laws that had the effect of restricting certain kinds of sexually explicit expression, see, *e. g.*, *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986).   But the abiding characteristic of valid time, place, and manner regulations is their content neutrality.   See *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791–796 (1989).   In *Vincent* the city prohibited all signs on public property, not to sup-

---

[1] Other regulations prohibit the sale of tobacco products "in any manner other than in a direct, face-to-face exchange," forbid self-service displays, and require that tobacco products be accessible only to store personnel. See §§ 21.04(2)(a), (c)–(d), §§ 22.06(2)(a), (c)–(d).   In addition, they prohibit sampling and promotional giveaways.   See §§ 21.04(1), 22.06(1).   I agree with the Court, see *ante*, at 567–570, that these regulations, which govern conduct rather than expression, should be upheld under the test of *United States* v. *O'Brien*, 391 U. S. 367 (1968).

press the message conveyed by any of the signs, but simply to minimize the esthetic effect of visual clutter. Likewise, the ordinance in *Renton* was aimed not at expression, but at the "secondary effects" caused by adult businesses.

The regulations here are very different. Massachusetts is not concerned with any "secondary effects" of tobacco advertising—it is concerned with the advertising's primary effect, which is to induce those who view the advertisements to purchase and use tobacco products. Cf. *Boos* v. *Barry*, 485 U. S. 312, 321 (1988) ("Listeners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton*"). In other words, it seeks to suppress speech about tobacco because it objects to the content of that speech. We have consistently applied strict scrutiny to such content-based regulations of speech. See, *e. g., Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 641–643 (1994).

## A

There was once a time when this Court declined to give any First Amendment protection to commercial speech. In *Valentine* v. *Chrestensen*, 316 U. S. 52 (1942), the Court went so far as to say that "the Constitution imposes [no] restraint on government as respects purely commercial advertising." *Id.*, at 54. That position was repudiated in *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976), which explained that even speech "which does 'no more than propose a commercial transaction'" is protected by the First Amendment. *Id.*, at 762 (quoting *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U. S. 376, 385 (1973)). Since then, the Court has followed an uncertain course—much of the uncertainty being generated by the malleability of the four-part balancing test of *Central Hudson.* See *44 Liquormart*, 517 U. S., at 520–522 (THOMAS, J., concurring in part and concurring in judgment).

I have observed previously that there is no "philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech." *Id.*, at 522. Indeed, I doubt whether it is even possible to draw a coherent distinction between commercial and noncommercial speech. See *id.*, at 523, n. 4 (citing Kozinski & Banner, Who's Afraid of Commercial Speech, 76 Va. L. Rev. 627 (1990)).[2]

It should be clear that if these regulations targeted anything other than advertising for commercial products—if, for example, they were directed at billboards promoting political candidates—all would agree that the restrictions should be subjected to strict scrutiny. In my view, an asserted government interest in keeping people ignorant by suppressing expression "is *per se* illegitimate and can no more justify regulation of 'commercial' speech than it can justify regulation of 'noncommercial' speech." 517 U. S., at 518 (THOMAS, J., concurring in part and concurring in judgment). That is essentially the interest asserted here, and, adhering to the views I expressed in *44 Liquormart*, I would subject the Massachusetts regulations to strict scrutiny.

## B

Even if one accepts the premise that commercial speech generally is entitled to a lower level of constitutional protection than are other forms of speech, it does not follow that the regulations here deserve anything less than strict scrutiny. Although we have recognized several categories of

---

[2] Tobacco advertising provides a good illustration. The sale of tobacco products is the subject of considerable political controversy, and not surprisingly, some tobacco advertisements both promote a product and take a stand in this political debate. See Brief for National Association of Convenience Stores as *Amicus Curiae* 20–22. A recent cigarette advertisement, for example, displayed a brand logo next to text reading, "Why do politicians smoke cigars while taxing cigarettes?" App. to Brief for National Association of Convenience Stores as *Amicus Curiae* 2a.

speech that normally receive reduced First Amendment protection, or no First Amendment protection at all, we have never held that the government may regulate speech within those categories in any way that it wishes. Rather, we have said "that these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content.*" *R. A. V.* v. *St. Paul,* 505 U. S. 377, 383 (1992). Even when speech falls into a category of reduced constitutional protection, the government may not engage in content discrimination for reasons unrelated to those characteristics of the speech that place it within the category. For example, a city may ban obscenity (because obscenity is an unprotected category, see, *e. g., Roth* v. *United States,* 354 U. S. 476 (1957)), but it may not ban "only those legally obscene works that contain criticism of the city government." *R. A. V., supra,* at 384.

In explaining the distinction between commercial speech and other forms of speech, we have emphasized that commercial speech is both "more easily verifiable by its disseminator" and less likely to be "chilled by proper regulation." *Virginia Bd.,* 425 U. S., at 772, n. 24. These characteristics led us to conclude that, in the context of commercial speech, it is "less necessary to tolerate inaccurate statements for fear of silencing the speaker," and also that it is more "appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive." *Ibid.* Whatever the validity of this reasoning, it is limited to the peculiarly *commercial* harms that commercial speech can threaten—*i. e.,* the risk of deceptive or misleading advertising. As we observed in *R. A. V.:*

> "[A] State may choose to regulate price advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech that justifies depriving it of full First Amendment protection) is in its view greater there. But a State may not prohibit

only that commercial advertising that depicts men in a demeaning fashion." 505 U. S., at 388–389 (citations omitted).

In *44 Liquormart*, several Members of the Court said much the same thing:

"[W]hen a State entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands." 517 U. S., at 501 (opinion of STEVENS, J., joined by KENNEDY and GINSBURG, JJ.).

Whatever power the State may have to regulate commercial speech, it may not use that power to limit the content of commercial speech, as it has done here, "for reasons unrelated to the preservation of a fair bargaining process." Such content-discriminatory regulation—like all other content-based regulation of speech—must be subjected to strict scrutiny.

## C

In an effort to avoid the implications of these basic principles of First Amendment law, respondents make two principal claims. First, they argue that the regulations target deceptive and misleading speech. See Brief for Respondents 33 ("Petitioners' advertising clearly engenders 'the potential for deception or confusion' that allows for regulation of commercial speech based on its content" (quoting *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 65 (1983))). Second, they argue that the regulations restrict speech that promotes an illegal transaction—*i. e.*, the sale of tobacco to minors. See Brief for Respondents 15 ("The regulations . . . exhibit a close connection to a commercial transaction the State has prohibited").

Neither theory is properly before the Court. For purposes of summary judgment, respondents were willing to as-

sume "that the tobacco advertisements at issue here are truthful, nonmisleading speech about a lawful activity." 218 F. 3d, at 43. Although respondents now claim that they have not conceded this point, see Brief for Respondents 35, n. 17, the fact remains that they did not urge their theories in the lower courts, and in general, we do not consider arguments for affirmance that were not presented below. See, e. g., Glover v. United States, 531 U. S. 198, 205 (2001). These concessions should make this an easy case, one clearly controlled by 44 Liquormart and by Greater New Orleans Broadcasting Assn., Inc. v. United States, 527 U. S. 173 (1999). At all events, even if we were to entertain these arguments, neither is persuasive.

Respondents suggest that tobacco advertising is misleading because "its youthful imagery and . . . sheer ubiquity" leads children to believe "that tobacco use is desirable and pervasive." Brief for Respondents 33; see also Brief for United States as Amicus Curiae 7 ("[S]o many children lack the maturity in judgment to resist the tobacco industry's appeals to excitement, glamour, and independence"). This justification is belied, however, by the sweeping overinclusivity of the regulations. Massachusetts has done nothing to target its prohibition to advertisements appealing to "excitement, glamour, and independence"; the ban applies with equal force to appeals to torpor, homeliness, and servility. It has not focused on "youthful imagery"; smokers depicted on the sides of buildings may no more play shuffleboard than they may ride skateboards.

The regulations even prohibit a store from accurately stating the prices at which cigarettes are sold. Such a display could not possibly be misleading, unless one accepts the State's apparent view that the simple existence of tobacco advertisements misleads people into believing that tobacco use is more pervasive than it actually is. The State misunderstands the purpose of advertising. Promoting a product that is not yet pervasively used (or a cause that is not yet

widely supported) is a primary purpose of advertising. Tobacco advertisements would be no more misleading for suggesting pervasive use of tobacco products than are any other advertisements that attempt to expand a market for a product, or to rally support for a political movement. Any inference from the advertisements that businesses would like for tobacco use to be pervasive is entirely reasonable, and advertising that gives rise to that inference is in no way deceptive.

The State also contends that tobacco advertisements may be restricted because they propose an illegal sale of tobacco to minors. A direct solicitation of unlawful activity may of course be proscribed, whether or not it is commercial in nature. See *Brandenburg* v. *Ohio*, 395 U. S. 444 (1969) *(per curiam)*. The State's power to punish speech that solicits or incites crime has nothing to do with the commercial character of the speech. After all, it is often the case that solicitation to commit a crime is entirely noncommercial. The harm that the State seeks to prevent is the harm caused by the unlawful activity that is solicited; it is unrelated to the commercial transaction itself. Thus there is no reason to apply anything other than our usual rule for evaluating solicitation and incitement simply because the speech in question happens to be commercial. See *Carey* v. *Population Services Int'l*, 431 U. S. 678, 701–702 (1977).

Viewed as an effort to proscribe solicitation to unlawful conduct, these regulations clearly fail the *Brandenburg* test. A State may not "forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg, supra*, at 447. Even if Massachusetts could prohibit advertisements reading, "Hey kids, buy cigarettes here," these regulations sweep much more broadly than that. They cover "*any* . . . statement or representation . . . the purpose or effect of which is to promote the use or sale" of tobacco products, whether or not the statement is directly or indi-

rectly addressed to minors.   940 Code of Mass. Regs. § 21.03 (2000).   On respondents' theory, *all* tobacco advertising may be limited because *some* of its viewers may not legally act on it.

It is difficult to see any stopping point to a rule that would allow a State to prohibit all speech in favor of an activity in which it is illegal for minors to engage.   Presumably, the State could ban car advertisements in an effort to enforce its restrictions on underage driving.   It could regulate advertisements urging people to vote, because children are not permitted to vote.   And, although the Solicitor General resisted this implication of her theory, see Tr. of Oral Arg. 55–56, the State could prohibit advertisements for adult businesses, which children are forbidden to patronize.

At bottom, respondents' theory rests on the premise that an indirect solicitation is enough to empower the State to regulate speech, and that, as petitioners put it, even an advertisement directed at adults "will give any children who may happen to see it the wrong idea and therefore must be suppressed from public view."   Brief for Petitioners Lorillard Tobacco Co. et al. in No. 00–596, p. 36.   This view is foreign to the First Amendment.   "Every idea is an incitement," *Gitlow* v. *New York*, 268 U. S. 652, 673 (1925) (Holmes, J., dissenting), and if speech may be suppressed whenever it might inspire someone to act unlawfully, then there is no limit to the State's censorial power.   Cf. *American Booksellers Assn., Inc.* v. *Hudnut*, 771 F. 2d 323 (CA7 1985), aff'd, 475 U. S. 1001 (1986).

There is a deeper flaw in the State's argument.   Even if Massachusetts has a valid interest in regulating speech directed at children—who, it argues, may be more easily misled, and to whom the sale of tobacco products is unlawful—it may not pursue that interest at the expense of the free speech rights of adults.

The theory that public debate should be limited in order to protect impressionable children has a long historical pedi-

gree: Socrates was condemned for being "a doer of evil, inasmuch as he corrupts the youth." 1 Dialogues of Plato, Apology 348 (B. Jowett transl., 4th ed. 1953). But the theory has met with a less enthusiastic reception in this Court than it did in the Athenian assembly. In *Butler* v. *Michigan*, 352 U. S. 380 (1957), we struck down a statute restricting the sale of materials "'tending to incite minors to violent or depraved or immoral acts.'" *Id.*, at 381 (quoting then Mich. Penal Code § 343). The effect of the law, we observed, was "to reduce the adult population of Michigan to reading only what is fit 'for children." 352 U. S., at 383. As Justice Frankfurter colorfully put it, "Surely, this is to burn the house to roast the pig." *Ibid.*

We have held consistently that speech "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik* v. *Jacksonville,* 422 U. S. 205, 213–214 (1975); accord, *Bolger,* 463 U. S., at 74 ("The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox"). To be sure, in *FCC* v. *Pacifica Foundation,* 438 U. S. 726 (1978), we upheld the Federal Communications Commission's power to regulate indecent but nonobscene radio broadcasts. But *Pacifica* relied heavily on what it considered to be the "special justifications for regulation of the broadcast media that are not applicable to other speakers." *Reno* v. *American Civil Liberties Union,* 521 U. S. 844, 868 (1997). It emphasized that radio is *"uniquely* pervasive" and *"uniquely* accessible to children, even those too young to read." *Pacifica, supra,* at 748–749 (emphasis added).

Outside of the broadcasting context, we have adhered to the view that "the governmental interest in protecting children from harmful materials" does not "justify an unnecessarily broad suppression of speech addressed to adults." *Reno, supra,* at 875; see also *Playboy Entertainment,* 529 U. S., at 814 ("[T]he objective of shielding children does not

suffice to support a blanket ban if the protection can be accomplished by a less restrictive alternative"). Massachusetts may not avoid the application of strict scrutiny simply because it seeks to protect children.

## II

Under strict scrutiny, the advertising ban may be saved only if it is narrowly tailored to promote a compelling government interest. See, e. g., id., at 813. If that interest could be served by an alternative that is less restrictive of speech, then the State must use that alternative instead. See ibid.; Reno, supra, at 874. Applying this standard, the regulations here must fail.

## A

Massachusetts asserts a compelling interest in reducing tobacco use among minors. Applied to adults, an interest in manipulating market choices by keeping people ignorant would not be legitimate, let alone compelling. See supra, at 575. But assuming that there is a compelling interest in reducing underage smoking, and that the ban on outdoor advertising promotes this interest, I doubt that the same is true of the ban on point-of-sale advertising below five feet. See 940 Code of Mass. Regs. §§ 21.04(5)(b), 22.06(5)(b) (2000). The Court of Appeals admitted to having "some misgivings about the effectiveness of a restriction that is based on the assumption that minors under five feet tall will not, or will less frequently, raise their view above eye-level," 218 F. 3d, at 51, as well it might have, since respondents have produced no evidence to support this counterintuitive assumption. Obviously even short children can see objects that are taller than they are. Anyway, by the time they are 12½ years old, both the median girl and the median boy are over five feet tall. See U. S. Centers for Disease Control and Prevention, Growth Charts (2000). Thus, there is no reason to believe that this regulation does anything to protect minors from

exposure to tobacco advertising.[3]   Far from serving a compelling interest, the ban on displays below five feet seems to lack even a minimally rational relationship to any conceivable interest.

There is also considerable reason to doubt that the restrictions on cigar and smokeless tobacco outdoor advertising promote any state interest.   Outdoor advertising for cigars, after all, is virtually nonexistent.   Cigar makers use no billboards in Massachusetts, and in fact their nationwide outdoor advertising budget is only about $50,000 per year.   See 218 F. 3d, at 49.   To the extent outdoor advertising exists, there is no evidence that it is targeted at youth or has a significant effect on youth.   The Court of Appeals focused on the State's evidence of a relationship between "tobacco advertising and tobacco use," *id.*, at 48, thus eliding the dearth of evidence showing any relationship between *cigar* advertising and *cigar* use by minors.   Respondents principally rely on a National Cancer Institute report on cigar smoking, see Brief for Respondents 39, n. 19.   But that report contains only the conclusory assertion that cigars are being "heavily promoted in ways likely to influence adolescent use," and it does not even discuss outdoor advertising, instead focusing on "[e]ndorsements by celebrities," "the re-

---

[3] This is not to say that the regulation does nothing at all.   As the Court points out, see *ante*, at 565, security concerns require that convenience stores be designed so that the interior of the store is visible from the street.   See also Occupational Safety and Health Administration, Recommendations for Workplace Violence Prevention Programs in Late-Night Retail Establishments 6 (1998) ("Shelves should be low enough to assure good visibility throughout the store").   The § 21.04(5)(b) ban on displays below five feet and the § 21.04(5)(a) ban on displays visible from outside the store, combined with these security concerns, would prevent many convenience stores from displaying any tobacco products at all.   Thus, despite the State's disclaimers, see Brief for Respondents 30 ("The State, quite clearly, is not trying to suppress altogether the communication of product information to interested consumers"), the restrictions effectively produce a total ban.

surgence of cigar smoking in movies," and "cigar lifestyle magazines such as 'Cigar Aficionado.'" National Cancer Institute, Cigars: Health Effects and Trends, Smoking and Tobacco Control Monograph No. 9, pp. 14–15 (1998), Record, Doc. No. 39, Exh. 67. The report candidly acknowledges that "[a]ddditional information is needed to better character-ize marketing efforts for cigars" and "to learn the extent to which advertising and promotion for cigars . . . reaches and affects kids." *Id.*, at 216–217. In other words, respondents have adduced no evidence that a ban on cigar advertising will do anything to promote their asserted interest.

Much the same is true of smokeless tobacco. Here re-spondents place primary reliance on evidence that, in the late 1960's, the U. S. Smokeless Tobacco Company increased its sales through advertising targeted at young males. See Brief for Respondents 39, n. 19. But this does nothing to show that advertising affecting minors is a problem today. The Court invokes the Food and Drug Administration's find-ings, see *ante*, at 559–560, but the report it cites based its conclusions on the observed "very large increase in the use of smokeless tobacco products by young people." 60 Fed. Reg. 41318 (1995). This premise is contradicted by one of respondents' own studies, which reports a large, steady *de-crease* in smokeless tobacco use among Massachusetts high school students during the 1990's. See App. 292. This finding casts some doubt on whether the State's interest in additional regulation is truly compelling. More importantly, because cigarette smoking among high school students has not exhibited such a trend, see *ibid.*, it indicates that re-spondents' effort to aggregate cigarettes and smokeless to-bacco is misguided.

## B

In any case, even assuming that the regulations advance a compelling state interest, they must be struck down because they are not narrowly tailored. The Court is correct, see *ante*, at 561–563, that the arbitrary 1,000-foot radius demon-

strates a lack of narrow tailoring, but the problem goes deeper than that. A prohibited zone defined solely by circles drawn around schools and playgrounds is necessarily overinclusive, regardless of the radii of the circles. Consider, for example, a billboard located within 1,000 feet of a school but visible only from an elevated freeway that runs nearby. Such a billboard would not threaten any of the interests respondents assert, but it would be banned anyway, because the regulations take no account of whether the advertisement could even be seen by children. The prohibited zone is even more suspect where, as here, it includes all but 10 percent of the area in the three largest cities in the State.

The loose tailoring of the advertising ban is displayed not only in its geographic scope but also in the nature of the advertisements it affects. The regulations define "advertisement" very broadly; the term includes any "written . . . statement or representation, made by" a person who sells tobacco products, "the purpose or effect of which is to promote the use or sale of the product." 940 Code of Mass. Regs. § 21.03 (2000). Almost everything a business does has the purpose of promoting the sale of its products, so this definition would cover anything a tobacco retailer might say. Some of the prohibited speech would not even be commercial. If a store displayed a sign promoting a candidate for Attorney General who had promised to repeal the tobacco regulations if elected, it probably would be doing so with the long-term purpose of promoting sales, and the display of such a sign would be illegal.

Even if the definition of "advertisement" were read more narrowly so as to require a specific reference to tobacco products, it still would have Draconian effects. It would, for example, prohibit a tobacconist from displaying a sign reading "Joe's Cigar Shop." The effect of this rule is not to make cigars impossible to find; retailers are after all allowed to display a 576-square-inch black-and-white sign reading "Tobacco Products Sold Here." § 22.06(6). Rather, it is to

make individual cigar retailers more difficult to identify by making them change their names. Respondents assert no interest in cigar retailer anonymity, and it is difficult to conceive of any other interest to which this rule could be said to be narrowly tailored.

The regulations fail the narrow tailoring inquiry for another, more fundamental reason. In addition to examining a narrower advertising ban, the State should have examined ways of advancing its interest that do not require limiting speech at all. Here, respondents had several alternatives. Most obviously, they could have directly regulated the conduct with which they were concerned. See, e. g., *Rubin* v. *Coors Brewing Co.*, 514 U. S. 476, 490–491 (1995) (invalidating ban on disclosure of alcohol content on beer labels, in part because the Government could have pursued alternatives such as "directly limiting the alcohol content of beers"); see also *44 Liquormart*, 517 U. S., at 524 (THOMAS, J., concurring in part and concurring in judgment) ("[I]t would seem that directly banning a product (or . . . otherwise restricting its sale in specific ways) would virtually always be at least as effective in discouraging consumption as merely restricting advertising"). Massachusetts already prohibits the sale of tobacco to minors, but it could take steps to enforce that prohibition more vigorously. It also could enact laws prohibiting the purchase, possession, or use of tobacco by minors. And, if its concern is that tobacco advertising communicates a message with which it disagrees, it could seek to counteract that message with "more speech, not enforced silence," *Whitney* v. *California*, 274 U. S. 357, 377 (1927) (Brandeis, J., concurring).

## III

Underlying many of the arguments of respondents and their *amici* is the idea that tobacco is in some sense *sui generis*—that it is so special, so unlike any other object of regulation, that application of normal First Amendment principles should be suspended. See, e. g., Brief for Respondents 50

(referring to tobacco use as "one of the State's—and indeed the Nation's—most urgent problems"); Brief for United States as *Amicus Curiae* 19–20 (cataloging the prevalence and the effects of tobacco use); Brief for American Medical Association et al. as *Amici Curiae* 24 (advocating "the authority of governments to protect children from uniquely dangerous messages"). Smoking poses serious health risks, and advertising may induce children (who lack the judgment to make an intelligent decision about whether to smoke) to begin smoking, which can lead to addiction. The State's assessment of the urgency of the problem posed by tobacco is a policy judgment, and it is not this Court's place to second-guess it. Nevertheless, it seems appropriate to point out that to uphold the Massachusetts tobacco regulations would be to accept a line of reasoning that would permit restrictions on advertising for a host of other products.

Tobacco use is, we are told, "the single leading cause of preventable death in the United States." Brief for United States as *Amicus Curiae* 19. The *second* largest contributor to mortality rates in the United States is obesity. Koplan & Dietz, Caloric Imbalance and Public Health Policy, 282 JAMA 1579 (1999). It is associated with increased incidence of diabetes, hypertension, and coronary artery disease, *ibid.*, and it represents a public health problem that is rapidly growing worse. See Mokdad et al., The Spread of the Obesity Epidemic in the United States, 1991–1998, 282 JAMA 1519 (1999). Although the growth of obesity over the last few decades has had many causes, a significant factor has been the increased availability of large quantities of high-calorie, high-fat foods. See Hill, Environmental Contributions to the Obesity Epidemic, 280 Science 1371 (1998). Such foods, of course, have been aggressively marketed and promoted by fast food companies. See Nestle & Jacobson, Halting the Obesity Epidemic, U. S. Dept. of Health and Human Services, 115 Public Health Reports 12, 18 (2000).

Respondents say that tobacco companies are covertly targeting children in their advertising. Fast food companies do so openly. See, *e. g.*, Kramer, McD's Steals Another Toy from BK, Advertising Age, Nov. 15, 1999, p. 1 (describing a McDonald's promotional campaign); Lucas, BK Takes Choice Message to Kids, Adweek, June 29, 1998, p. 4 (describing a Burger King promotional campaign). Moreover, there is considerable evidence that they have been successful in changing children's eating behavior. See Borzekowski & Robinson, The 30-Second Effect, 101 J. Am. Dietetic Assn. 42 (2001); Taras, Sallis, Patterson, Nader, & Nelson, Television's Influence on Children's Diet and Physical Activity, 10 J. Dev. & Behav. Pediatrics 176 (1989). The effect of advertising on children's eating habits is significant for two reasons. First, childhood obesity is a serious health problem in its own right. Troiano & Flegal, Overweight Children and Adolescents, 101 Pediatrics 497 (1998). Second, eating preferences formed in childhood tend to persist in adulthood. Birch & Fisher, Development of Eating Behaviors Among Children and Adolescents, 101 Pediatrics 539 (1998). So even though fast food is not addictive in the same way tobacco is, children's exposure to fast food advertising can have deleterious consequences that are difficult to reverse.

To take another example, the third largest cause of preventable deaths in the United States is alcohol. McGinnis & Foege, Actual Causes of Death in the United States, 270 JAMA 2207, 2208 (1993). Alcohol use is associated with tens of thousands of deaths each year from cancers and digestive diseases. *Id.*, at 2208–2209. And the victims of alcohol use are not limited to those who drink alcohol. In 1996, over 17,000 people were killed, and over 321,000 people were injured, in alcohol-related car accidents. U. S. Dept. of Justice, Alcohol and Crime 13 (1998). Each year, alcohol is involved in several million violent crimes, including almost 200,000 sexual assaults. *Id.*, at 3–4.

Although every State prohibits the sale of alcohol to those under age 21, much alcohol advertising is viewed by children. Federal Trade Commission, J. Evans & R. Kelly, Self-Regulation in the Alcohol Industry (Sept. 1999); Grube & Wallack, Television Beer Advertising and Drinking Knowledge, Beliefs, and Intentions among Schoolchildren, 84 Am. J. Pub. Health 254 (1994). Not surprisingly, there is considerable evidence that exposure to alcohol advertising is associated with underage drinking. See Atkin, Survey and Experimental Research on Effects of Alcohol Advertising, in The Effects of the Mass Media on the Use and Abuse of Alcohol 39 (S. Martin ed. 1995); Madden & Grube, The Frequency and Nature of Alcohol and Tobacco Advertising in Televised Sports, 1990 through 1992, 84 Am. J. Pub. Health 297 (1994).

Like underage tobacco use, underage drinking has effects that cannot be undone later in life. Those who begin drinking early are much more likely to become dependent on alcohol. Indeed, the probability of lifetime alcohol dependence decreases approximately 14 percent with each additional year of age at which alcohol is first used. Grant & Dawson, Age at Onset of Alcohol Use and its Association with DSM–IV Alcohol Abuse and Dependence, 9 J. Substance Abuse 103, 108 (1997). And obviously the effects of underage drinking are irreversible for the nearly 1,700 Americans killed each year by teenage drunk drivers. See National Highway Traffic Safety Administration, 1998 Youth Fatal Crash and Alcohol Facts.

Respondents have identified no principle of law or logic that would preclude the imposition of restrictions on fast food and alcohol advertising similar to those they seek to impose on tobacco advertising. Cf. Tr. of Oral Arg. 56–57. In effect, they seek a "vice" exception to the First Amendment. No such exception exists. See *44 Liquormart*, 517 U. S., at 513–514 (opinion of STEVENS, J., joined by KENNEDY, THOMAS, and GINSBURG, JJ.). If it did, it would have almost no limit, for "any product that poses some threat to

public health or public morals might reasonably be characterized by a state legislature as relating to 'vice activity.'" *Id.,* at 514. That is why "a 'vice' label that is unaccompanied by a corresponding prohibition against the commercial behavior at issue fails to provide a principled justification for the regulation of commercial speech about that activity." *Ibid.*

No legislature has ever sought to restrict speech about an activity it regarded as harmless and inoffensive. Calls for limits on expression always are made when the specter of some threatened harm is looming. The identity of the harm may vary. People will be inspired by totalitarian dogmas and subvert the Republic. They will be inflamed by racial demagoguery and embrace hatred and bigotry. Or they will be enticed by cigarette advertisements and choose to smoke, risking disease. It is therefore no answer for the State to say that the makers of cigarettes are doing harm: perhaps they are. But in that respect they are no different from the purveyors of other harmful products, or the advocates of harmful ideas. When the State seeks to silence them, they are all entitled to the protection of the First Amendment.

JUSTICE SOUTER, concurring in part and dissenting in part.

I join Parts I, II–C, II–D, III–A, III–B–1, III–C, and III–D of the Court's opinion. I join Part I of the opinion of JUSTICE STEVENS concurring in part, concurring in the judgment in part, and dissenting in part. I respectfully dissent from Part III–B–2 of the opinion of the Court, and like JUSTICE STEVENS would remand for trial on the constitutionality of the 1,000-foot limit.

JUSTICE STEVENS, with whom JUSTICE GINSBURG and JUSTICE BREYER join, and with whom JUSTICE SOUTER joins as to Part I, concurring in part, concurring in the judgment in part, and dissenting in part.

This suit presents two separate sets of issues. The first—involving pre-emption—is straightforward. The second—

involving the First Amendment—is more complex. Because I strongly disagree with the Court's conclusion that the Federal Cigarette Labeling and Advertising Act of 1965 (FCLAA or Act), 15 U. S. C. § 1331 *et seq.*, as amended, precludes States and localities from regulating the location of cigarette advertising, I dissent from Parts II–A and II–B of the Court's opinion. On the First Amendment questions, I agree with the Court both that the outdoor advertising restrictions imposed by Massachusetts serve legitimate and important state interests and that the record does not indicate that the measures were properly tailored to serve those interests. Because the present record does not enable us to adjudicate the merits of those claims on summary judgment, I would vacate the decision upholding those restrictions and remand for trial on the constitutionality of the outdoor advertising regulations. Finally, because I do not believe that either the point-of-sale advertising restrictions or the sales practice restrictions implicate significant First Amendment concerns, I would uphold them in their entirety.

## I

As the majority acknowledges, *ante*, at 541–542, under prevailing principles, any examination of the scope of a preemption provision must " 'start with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' " *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 516 (1992) (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)); see also, *e. g., California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 325 (1997); *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470, 475 (1996). As the regulations at issue in this suit implicate two powers that lie at the heart of the States' traditional police power—the power to regulate land usage and the power to protect the health and safety of minors—our precedents require that the Court construe the pre-emption provision "narrow[ly]." *Id.*, at 485;

see also *Cipollone*, 505 U. S., at 518. If Congress' intent to pre-empt a particular category of regulation is ambiguous, such regulations are not pre-empted.[1]

The text of the pre-emption provision must be viewed in context, with proper attention paid to the history, structure, and purpose of the regulatory scheme in which it appears. See, *e. g.*, *Medtronic*, 518 U. S., at 484–486; *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 655–656 (1995); *Cipollone*, 505 U. S., at 513–515, 519–520, 529, 530, n. 27; accord, *ante*, at 542.[2] An assessment of the scope of a pre-emption provision must give effect to a "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic*, 518 U. S., at 486.

This task, properly performed, leads inexorably to the conclusion that Congress did not intend to pre-empt state and local regulations of the location of cigarette advertising when it adopted the provision at issue in this suit. In both 1965 and 1969, Congress made clear the purposes of its regulatory

---

[1] See, *e. g.*, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 146–147 (1963) ("[W]e are not to conclude that Congress legislated the ouster of this [state] statute . . . in the absence of an unambiguous congressional mandate to that effect"); *Cipollone*, 505 U. S., at 533 (Blackmun, J., joined by KENNEDY and SOUTER, JJ., concurring in part, concurring in judgment in part, and dissenting in part) ("The principles of federalism and respect for state sovereignty that underlie the Court's reluctance to find pre-emption where Congress has not spoken directly to the issue apply with equal force where Congress has spoken, though ambiguously. In such cases, the question is not whether Congress intended to pre-empt state regulation, but to what extent. We do not, absent unambiguous evidence, infer a scope of pre-emption beyond that which clearly is mandated by Congress' language" (emphasis deleted)).

[2] Cf. *Central Hanover Bank & Trust Co.* v. *Commissioner*, 159 F. 2d 167, 169 (CA2 1947) (L. Hand, J.) ("There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will or a contract—than to read the words literally, forgetting the object which the document as a whole is meant to secure").

endeavor, explaining with precision the federal policies motivating its actions. According to the Acts, Congress adopted a "comprehensive Federal Program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health," for two reasons: (1) to inform the public that smoking may be hazardous to health and (2) to ensure that commerce and the interstate economy not be "impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." 15 U. S. C. § 1331.

In order to serve the second purpose it was necessary to pre-empt state regulation of the content of both cigarette labels and cigarette advertising. If one State required the inclusion of a particular warning on the package of cigarettes while another State demanded a different formulation, cigarette manufacturers would have been forced into the difficult and costly practice of producing different packaging for use in different States. To foreclose the waste of resources that would be entailed by such a patchwork regulatory system, Congress expressly precluded other regulators from requiring the placement on cigarette packaging of any "statement relating to smoking and health." § 1334(a). Similar concerns applied to cigarette advertising. If different regulatory bodies required that different warnings or statements be used when cigarette manufacturers advertised their products, the text and layout of a company's ads would have had to differ from locale to locale. The resulting costs would have come with little or no health benefit. Moreover, given the nature of publishing, it might well have been the case that cigarette companies would not have been able to advertise in national publications without violating the laws of some jurisdictions. In response to these concerns, Congress adopted a parallel provision pre-empting state and local regulations requiring inclusion in cigarette advertising of any "statement relating to smoking and health." § 1334(b) (1970 ed.) (amended 1970).

There was, however, no need to interfere with state or local zoning laws or other regulations prescribing limitations on the location of signs or billboards. Laws prohibiting a cigarette company from hanging a billboard near a school in Boston in no way conflict with laws permitting the hanging of such a billboard in other jurisdictions. Nor would such laws even impose a significant administrative burden on would-be advertisers, as the great majority of localities impose general restrictions on signage, thus requiring advertisers to examine local law before posting signs whether or not cigarette-specific laws are pre-empted. See *Greater N. Y. Metropolitan Food Council, Inc.* v. *Giuliani*, 195 F. 3d 100, 109 (CA2 1999) ("Divergent local zoning restrictions on the location of sign advertising are a commonplace feature of the national landscape and cigarette advertisers have always been bound to observe them"). Hence, it is unsurprising that Congress did not include any provision in the 1965 Act pre-empting location restrictions.

The Public Health Cigarette Smoking Act of 1969 (1969 Act), § 2, 84 Stat. 87, made two important changes in the pre-emption provision. First, it limited the applicability of the advertising prong to States and localities, paving the way for further federal regulation of cigarette advertising. FCLAA, § 4. Second, it expanded the scope of the advertising pre-emption provision. Where previously States were prohibited from requiring particular statements in cigarette advertising based on health concerns, they would henceforth be prohibited from imposing any "requirement or prohibition based on smoking and health . . . with respect to the advertising or promotion" of cigarettes. § 5(b), 15 U. S. C. § 1334(b).[3]

---

[3] In *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 521 (1992), we held that one of the consequences of this change in language was that after 1969 the statute pre-empts some common-law actions.

Ripped from its context, this provision could theoretically be read as a breathtaking expansion of the limitations imposed by the 1965 Act. However, both our precedents and common sense require us to read statutory provisions—and, in particular, pre-emption clauses—in the context of both their neighboring provisions and of the history and purpose of the statutory scheme. See *supra*, at 592. When so viewed, it is quite clear that the 1969 amendments were intended to expand the provision to capture a narrow set of content regulations that would have escaped pre-emption under the prior provision, not to fundamentally reorder the division of regulatory authority between the Federal and State Governments.

All signs point inescapably to the conclusion that Congress only intended to pre-empt content regulations in the 1969 Act. It is of crucial importance that, in making modifications of the pre-emption provision, Congress did not alter the statement laying out the federal policies the provision was intended to serve. See 15 U. S. C. § 1331. To this day, the stated federal policies in this area are (1) to inform the public of the dangers of cigarette smoking and (2) to protect the cigarette companies from the burdens of confusing and contradictory state regulations of their labels and advertisements. See *ibid.* The retention of this provision unchanged is strong evidence that Congress' only intention in expanding the pre-emption clause was to capture forms of content regulation that had fallen through the cracks of the prior provision—for example, state laws prohibiting cigarette manufacturers from making particular claims in their advertising or requiring them to utilize specified layouts or include particular graphics in their marketing.[4]

---

[4] Because of the nature of magazine publishing and distribution, it is conceivable that a State or locality might cause the kind of regulatory confusion the statute was drafted to prevent by adopting a law prohibiting the advertising of cigarettes in any publication distributed within its

The legislative history of the provision also supports such a reading. The record does not contain any evidence that Congress intended to expand the scope of pre-emption beyond content restrictions.[5] To the contrary, the Senate Report makes it clear that the changes merely "clarified" the scope of the original provision. S. Rep. No. 91-566, p. 12 (1969). Even as amended, Congress perceived the provision as "narrowly phrased" and emphasized that its purpose is to "avoid the chaos created by a multiplicity of conflicting regulations." *Ibid.* According to the Senate Report, the changes "in no way affect the power of any state or political subdivision of any state with respect to . . . the sale of cigarettes to minors . . . or similar police regulations." *Ibid.*

In analyzing the scope of the pre-emption provision, the Courts of Appeals have almost uniformly concluded that state and local laws regulating the location of billboards and signs are not pre-empted. See *Consolidated Cigar Corp.* v. *Reilly,* 218 F. 3d 30, 39-41 (CA1 2000) (case below); *Greater New York Metropolitan Food Council, Inc.* v. *Giuliani,* 195 F. 3d 100, 104-110 (CA2 1999); *Federation of Advertising Industry Representatives, Inc.* v. *Chicago,* 189 F. 3d 633,

---

boundaries. There is at least a modicum of support for the suggestion that Congress may have intended the pre-emption of such restrictions. See *id.,* at 515, n. 11 (noting that California was considering such a ban at the time Congress was considering the 1969 Act). However, the concerns posed by the diverse regulation of national publications are not present with regard to the local regulation of the location of signs and billboards.

[5] At one point, the Court briefly argues that it would be wrong to conclude that Congress intended to preclude only content restrictions, because it imposed a location restriction (a ban on television and radio advertising) in another provision of the same bill. See *ante,* at 548-549. This argument is something of a non sequitur. The fact that Congress, in adopting a comprehensive legislative package, chose to impose a federal location restriction for a national medium has no bearing on whether, in a separate provision, the Legislature intended to strip States and localities of the authority to impose location restrictions for purely local advertising media.

636–640 (CA7 1999); *Penn Advertising of Baltimore, Inc.* v. *Mayor and City Council of Baltimore*, 63 F. 3d 1318 (CA4 1995); contra, *Lindsey* v. *Tacoma-Pierce Cty. Health Dept.*, 195 F. 3d 1065 (CA9 1999). The decisions in those cases relied heavily upon our discussion of the same pre-emption provision in *Cipollone*, 505 U. S., at 515–524. In *Cipollone*, while the Members of the Court expressed three different opinions concerning the scope of pre-emption mandated by the provision, those differences related entirely to which, if any, of the plaintiff's claims based on the *content* of the defendants' advertising were pre-empted by § 5. Nary a word in any of the three *Cipollone* opinions supports the thesis that § 5 should be interpreted to pre-empt state regulation of the location of signs advertising cigarettes. Indeed, seven of the nine Justices subscribed to opinions that explicitly tethered the scope of the pre-emption provision to Congress' concern with "diverse, nonuniform, and confusing cigarette labeling and advertising regulations." *Id.*, at 519; *id.*, at 534, 541 (opinion of Blackmun, J., joined by KENNEDY and SOUTER, JJ.).

I am firmly convinced that, when Congress amended the pre-emption provision in 1969, it did not intend to expand the application of the provision beyond content regulations.[6]

---

[6] Petitioners suggest in passing that Massachusetts' regulation amounts to a "near-total ba[n]," Brief for Petitioners Lorillard Tobacco Co. et al. in No. 00–596, p. 22, and thus is a *de facto* regulation of the content of cigarette ads. But we need not consider today the circumstances in which location restrictions approximating a total ban might constitute regulation of content and thus be pre-empted by the Act, because petitioners have failed to introduce sufficient evidence to create a genuine issue as to that claim. Petitioners introduced maps purporting to show that cigarette advertising is barred in 90.6% of Boston proper, 87.8% of Worcester, and 88.8% of Springfield. See App. 165–167. But the maps do not distinguish between the area restricted due to the regulation at issue here and the area restricted due to pre-existing regulations, such as general zoning requirements applicable to all outdoor advertising. Nor do the maps show the percentage (with respect to either area or population) of the State that is off limits to cigarette advertising; they cover only three cities

I, therefore, find the conclusion inescapable that the zoning regulation at issue in this suit is not a "requirement or prohibition . . . with respect to . . . advertising" within the meaning of the 1969 Act.[7]   Even if I were not so convinced, however, I would still dissent from the Court's conclusion with regard to pre-emption, because the provision is, at the very least, ambiguous.   The historical record simply does not reflect that it was Congress' "'clear and manifest purpose,'" *id.*, at 516, to pre-empt attempts by States to utilize their traditional zoning authority to protect the health and welfare of minors.   Absent such a manifest purpose, Massachusetts and its sister States retain their traditional police powers.[8]

---

containing approximately 14% of the State's population.   See U. S. Census Bureau, Statistical Abstract of the United States 28, 47, 49 (1999) (providing population figures for 1998).   The area in which cigarette advertising is restricted is likely to be considerably less in less densely populated portions of the State.   And even on the interpretation of this data most favorable to petitioners, the Massachusetts regulation still permits indoor and outdoor cigarette advertising in at least 10% of the geographical area of the State.   In short, the regulation here is not the equivalent of a total ban on cigarette advertising.

[7] Hence, while I agree in large part with the substance of the arguments proffered by the respondents and the United States on the pre-emption issue, I reject their conclusion that the content/location distinction finds expression in the limiting phrase "based on smoking and health."   See Brief for Respondents 20; Brief for United States as *Amicus Curiae* 5; accord, *Penn Advertising of Baltimore, Inc.* v. *Mayor and City Council of Baltimore*, 63 F. 3d 1318 (CA4 1995).   Instead, I would follow the First, Second, and Seventh Circuits in concluding that a statute regulating the location of advertising is not a "requirement or prohibition . . . with respect to . . . advertising" within the meaning of the 1969 Act.   See *Consolidated Cigar Corp.* v. *Reilly*, 218 F. 3d 30, 39–41 (CA1 2000) (case below); *Greater N. Y. Metropolitan Food Council, Inc.* v. *Giuliani*, 195 F. 3d 100, 104–110 (CA2 1999); *Federation of Advertising Industry Representatives, Inc.* v. *Chicago*, 189 F. 3d 633, 636–640 (CA7 1999).

[8] The Court's holding that federal law precludes States and localities from protecting children from dangerous products within 1,000 feet of a school is particularly ironic given the Court's conclusion six years ago that

## II

On the First Amendment issues raised by petitioners, my disagreements with the majority are less significant. I would, however, reach different dispositions as to the 1,000-foot rule and the height restrictions for indoor advertising, and my evaluation of the sales practice restrictions differs from the Court's.

### The 1,000-Foot Rule

I am in complete accord with the Court's analysis of the importance of the interests served by the advertising restrictions. As the Court lucidly explains, few interests are more "compelling," *ante*, at 564, than ensuring that minors do not become addicted to a dangerous drug before they are able to make a mature and informed decision as to the health risks associated with that substance. Unlike other products sold for human consumption, tobacco products are addictive and ultimately lethal for many long-term users. When that interest is combined with the State's concomitant concern for the effective enforcement of its laws regarding the sale of tobacco to minors, it becomes clear that Massachusetts' regulations serve interests of the highest order and are, therefore, immune from any ends-based challenge, whatever level of scrutiny one chooses to employ.

Nevertheless, noble ends do not save a speech-restricting statute whose means are poorly tailored. Such statutes

---

the Federal Government lacks the constitutional authority to impose a similarly motivated ban. See *United States* v. *Lopez,* 514 U. S. 549 (1995). Despite the absence of any identified federal interest in creating "an invisible federal zone extending 1,000 feet beyond the (often irregular) boundaries of the school property," as the majority construes it today, the "statute now before us forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise," *id.,* at 583 (KENNEDY, J., concurring). I wonder why a Court sensitive to federalism concerns would adopt such a strange construction of statutory language whose quite different purpose Congress took pains to explain.

may be invalid for two different reasons. First, the means chosen may be insufficiently related to the ends they purportedly serve. See, *e. g., Rubin* v. *Coors Brewing Co.,* 514 U. S. 476 (1995) (striking a statute prohibiting beer labels from displaying alcohol content because the provision did not significantly forward the government's interest in the health, safety, and welfare of its citizens). Alternatively, the statute may be so broadly drawn that, while effectively achieving its ends, it unduly restricts communications that are unrelated to its policy aims. See, *e. g., United States* v. *Playboy Entertainment Group, Inc.,* 529 U. S. 803, 812 (2000) (striking a statute intended to protect children from indecent television broadcasts, in part because it constituted "a significant restriction of communication between speakers and willing adult listeners"). The second difficulty is most frequently encountered when government adopts measures for the protection of children that impose substantial restrictions on the ability of adults to communicate with one another. See, *e. g., Playboy Entertainment Group, Inc., supra; Reno* v. *American Civil Liberties Union,* 521 U. S. 844 (1997); *Sable Communications of Cal., Inc.* v. *FCC,* 492 U. S. 115 (1989).

To my mind, the 1,000-foot rule does not present a tailoring problem of the first type. For reasons cogently explained in our prior opinions and in the opinion of the Court, we may fairly assume that advertising stimulates consumption and, therefore, that regulations limiting advertising will facilitate efforts to stem consumption.[9] See, *e. g., Rubin,* 514 U. S., at 487; *United States* v. *Edge Broadcasting Co.,* 509 U. S. 418, 434 (1993); *ante,* at 557. Furthermore, if the government's intention is to limit consumption by a particular segment of the community—in this case, minors—it is

---

[9] Moreover, even if it were our practice to require a particularized showing of the effects of advertising on consumption, the respondents have met that burden in this suit. See *ante,* at 557–561 (summarizing the evidence).

appropriate, indeed necessary, to tailor advertising restrictions to the areas where that segment of the community congregates—in this case, the area surrounding schools and playgrounds.

However, I share the majority's concern as to whether the 1,000-foot rule unduly restricts the ability of cigarette manufacturers to convey lawful information to adult consumers. This, of course, is a question of line-drawing. While a ban on all communications about a given subject would be the most effective way to prevent children from exposure to such material, the State cannot by fiat reduce the level of discourse to that which is "fit for children." *Butler* v. *Michigan*, 352 U. S. 380, 383 (1957); cf. *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 74 (1983) ("The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox"). On the other hand, efforts to protect children from exposure to harmful material will undoubtedly have some spillover effect on the free speech rights of adults. See, *e. g., FCC* v. *Pacifica Foundation*, 438 U. S. 726, 749–750, and n. 28 (1978).

Finding the appropriate balance is no easy matter. Though many factors plausibly enter the equation when calculating whether a child-directed location restriction goes too far in regulating adult speech, one crucial question is whether the regulatory scheme leaves available sufficient "alternative avenues of communication." *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 50 (1986); *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 819 (1984) (Brennan, J., dissenting); accord, *ante*, at 563. Because I do not think the record contains sufficient information to enable us to answer that question, I would vacate the award of summary judgment upholding the 1,000-foot rule and remand for trial on that issue. Therefore, while I agree with the majority that the Court of Appeals did not sufficiently consider the implications of the 1,000-foot rule for the lawful communication of adults, see *ante*, at 561–566,

I dissent from the disposition reflected in Part III–B–2 of the Court's opinion.

There is no doubt that the 1,000-foot rule prohibits cigarette advertising in a substantial portion of Massachusetts' largest cities. Even on that question, however, the parties remain in dispute as to the percentage of these urban areas that is actually off limits to tobacco advertising. See *ante*, at 562. Moreover, the record is entirely silent on the impact of the regulation in other portions of the Commonwealth. The dearth of reliable statistical information as to the scope of the ban is problematic.

More importantly, the Court lacks sufficient qualitative information as to the areas where cigarette advertising is prohibited and those where it is permitted. The fact that 80% or 90% of an urban area is unavailable to tobacco advertisements may be constitutionally irrelevant if the available areas are so heavily trafficked or so central to the city's cultural life that they provide a sufficient forum for the propagation of a manufacturer's message. One electric sign in Times Square or at the foot of the Golden Gate Bridge may be seen by more potential customers than a hundred signs dispersed in residential neighborhoods.

Finally, the Court lacks information as to other avenues of communication available to cigarette manufacturers and retailers. For example, depending on the answers to empirical questions on which we lack data, the ubiquity of print advertisements hawking particular brands of cigarettes might suffice to inform adult consumers of the special advantages of the respective brands. Similarly, print advertisements, circulars mailed to people's homes, word of mouth, and general information may or may not be sufficient to imbue the adult population with the knowledge that particular stores, chains of stores, or types of stores sell tobacco products.[10]

---

[10] As the above observations indicate, the analysis as to whether the 1,000-foot rule impermissibly curtails speech between adults will require a particularized analysis that may well ask slightly different questions—

In granting summary judgment for the respondents, the District Judge treated the First Amendment issues in this suit as pure questions of law and stated that "there are no material facts in dispute concerning these issues." 84 F. Supp. 2d 180, 183 (Mass. 2000). With due respect, I disagree. While the ultimate question before us is one of law, the answer to that question turns on complicated factual questions relating to the practical effects of the regulations. As the record does not reveal the answer to these disputed questions of fact, the court should have denied summary judgment to both parties and allowed the parties to present further evidence.

I note, moreover, that the alleged "overinclusivity" of the advertising regulations, *ante*, at 578 (THOMAS, J., concurring in part and concurring in judgment), while relevant to whether the regulations are narrowly tailored, does not "beli[e]" the claim that tobacco advertising imagery misleads children into believing that smoking is healthy, glamorous, or sophisticated, *ibid.* See Brief for American Legacy Foundation as *Amicus Curiae* 4–5, and nn. 9, 10; Brief for City of Los Angeles et al. as *Amici Curiae* 4 (documenting charge that advertisements for cigarettes and smokeless tobacco target underage smokers). For purposes of summary judgment, the State conceded that the tobacco companies' advertising concerns lawful activity and is not misleading. Under the Court's disposition of the cases today, the State remains free to proffer evidence that the advertising is in fact misleading. See *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976) ("[M]uch commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem"). I would vacate the grant of summary judgment to respondents on this issue and remand for further proceedings.

---

and conceivably could reach different results—with regard to the constitutionality of the restrictions as applied to manufacturers and retailers.

The Sales Practice and Indoor Advertising Restrictions

After addressing petitioners' challenge to the sales practice restrictions imposed by the Massachusetts statute, the Court concluded that these provisions did not violate the First Amendment. I concur in that judgment, but write separately on this issue to make two brief points.

First, I agree with the District Court and the Court of Appeals that the sales practice restrictions are best analyzed as regulating conduct, not speech. See 218 F. 3d, at 53. While the decision how to display one's products no doubt serves a marginal communicative function, the same can be said of virtually any human activity performed with the hope or intention of evoking the interest of others. This Court has long recognized the need to differentiate between legislation that targets expression and legislation that targets conduct for legitimate non-speech-related reasons but imposes an incidental burden on expression. See, e. g., United States v. O'Brien, 391 U. S. 367 (1968). However difficult that line may be to draw, it seems clear to me that laws requiring that stores maintain items behind counters and prohibiting self-service displays fall squarely on the conduct side of the line. Restrictions as to the accessibility of dangerous or legally restricted products are a common feature of the regulatory regime governing American retail stores. I see nothing the least bit constitutionally problematic in requiring individuals to ask for the assistance of a salesclerk in order to examine or purchase a handgun, a bottle of penicillin, or a package of cigarettes.

Second, though I admit the question is closer, I would, for similar reasons, uphold the regulation limiting tobacco advertising in certain retail establishments to the space five feet or more above the floor.[11] When viewed in isolation, this provision appears to target speech. Further, to the ex-

---

[11] This ban only applies to stores located within 1,000 feet of a school or playground and contains an exception for adult-only establishments. See ante, at 535, 536.

tent that it does target speech it may well run into constitutional problems, as the connection between the ends the statute purports to serve and the means it has chosen are dubious. Nonetheless, I am ultimately persuaded that the provision is unobjectionable because it is little more than an adjunct to the other sales practice restrictions. As the Commonwealth of Massachusetts can properly legislate the placement of products and the nature of displays in its convenience stores, I would not draw a distinction between such restrictions and height restrictions on related product advertising. I would accord the Commonwealth some latitude in imposing restrictions that can have only the slightest impact on the ability of adults to purchase a poisonous product and may save some children from taking the first step on the road to addiction.

## III

Because I strongly disagree with the Court's conclusion on the pre-emption issue, I dissent from Parts II-A and II-B of its opinion. Though I agree with much of what the Court has to say about the First Amendment, I ultimately disagree with its disposition or its reasoning on each of the regulations before us.[12]

---

[12] Reflecting my partial agreement with the Court, I join Parts I, II-C, II-D, and III-B-1 and concur in the judgment reflected in Part III-D.